[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1360 
Appellant was convicted in Calhoun County of the murder of Mary Louise Williams. Notice was given by the District Attorney that the Habitual Offender Act would be invoked, and, after a pre-sentencing hearing, the trial court sentenced appellant to life imprisonment without parole.
At the close of the state's evidence, appellant moved for the exclusion of the state's evidence for lack of prima facie proof of murder. Appellant also argues the insufficiency of the evidence on appeal. Thus, a detailed recital of the facts is necessary.
The state's first witness was Mary Ann Farrell, the victim's sister. Ms. Farrell last saw the victim around noon on Wednesday, September 30, 1981, at their mother's house in Hobson City. According to Ms. Farrell, appellant was living with another of the victim's sisters, Betty Joyce Wright.
After sitting on the porch for a while, the victim, appellant, and a Carl Cooley got into appellant's car and headed towards West Anniston. The victim had expressed a desire to rent a motel room for a while, because she had fought with the man she was living with and had decided to move. They left around 12:30.
Carl Wesley Cooley was called to the stand. Mr. Cooley testified that he asked appellant to give him a ride to his girl friend's house on the way to the motel. The three of them left the victim's mother's house around noon. The witness rode in front with the appellant while the victim rode in back. Before reaching the witness's girl friend's house, the three of them stopped very briefly at a gas station where the witness bought himself a grape cola and the appellant a Miller beer. The witness was let off at his girl friend's house around 12:45 p.m. He stated that in his opinion the trip took about 45 minutes.
According to Mr. Cooley, appellant and the victim discussed the victim's relationship with the man she was living with, Willie Towns, while they were in the car. Appellant told the victim that Towns would kill her before the weekend.
Diane Houston, the Hobson City Clerk, testified that she received a phone call while at work around 2:30 or 3:00 the afternoon of October 2, 1981, two days after the victim had disappeared. The caller, a male who identified himself as "Robert Miller," told her that he was hunting in the woods near a local rock quarry and had run across a black female's body. The caller gave directions to the location of the body and agreed to meet the police there.
After the call, the witness contacted the Calhoun Sheriff's Department and the Hobson City Police Department. The officials subsequently found the body where "Robert Miller" had told the witness he had found it.
On October 8, while monitoring outgoing calls on the City phone, the witness recognized the voice over the phone as that of the man calling himself "Robert Miller." When Mrs. Houston looked up to see who was using that line, she saw the appellant using the phone. According to the witness, appellant was the man who called on October *Page 1361 
2 giving directions to the body. She immediately informed the Hobson City Police Department.
The witness had used two different phones on the two occasions that she heard appellant's voice. On cross-examination, the witness testified that she had listened to the second conversation about thirty seconds.
Ed Traylor, an investigator for the ABI, was one of the first officials who arrived at the scene of the body. He helped photograph the area, make measurements, and collect evidence. He also obtained a statement from appellant that night. Appellant was not then a suspect.
In this first statement, appellant told Officer Traylor that, on the morning of September 30, he had driven the victim's mother, Mrs. Ruby Fluker, to the welfare office. While there, the victim called from the food stamp office and asked appellant to pick her up there because she had argued with Willie Towns, her boyfriend, and he had beaten her. Appellant drove to the food stamp office and picked up the victim. According to appellant, the victim's eye was swollen. He took her to the Anniston City Police Department, where she was told to get the key to Towns' residence and the police would then escort her.
Appellant drove the victim to Towns' residence where they met Towns as he walked up from the street. Towns allegedly told the victim that, if she returned, he would kill her. The victim got her clothes, including a leather coat.
After a short visit at Mrs. Fluker's house, the victim asked appellant to take her to the Jackson Motel where she could rent a room. He gave her a ride to the Jackson Motel and let her off at the corner of 12th Street. He gave the victim 60 or 70 cents, and the victim asked him to take her clothes to her mother's house except for her leather coat which he was instructed to give to his girl friend for safekeeping. When he left the victim, she was wearing blue pants, tennis shoes, and a blouse with flowers on it.
Appellant also told Officer Traylor that Towns had a violent temperament towards the victim.
He finished his statement by stating that a few hours after the victim's body was found, he and some of the victim's relatives rode past Towns' residence, where they found a piece of the blood-stained blouse the victim was wearing the day she disappeared hanging on Towns' fence. They turned the blouse over to the Hobson City Police.
Calhoun Deputy Sheriff Bobby Clark was at the scene of the body. He identified a number of photographs of the area. He did not notice any blood on the ground around the body. He did notice bent shrubs and small trees in the general vicinity.
Deputy Sheriff Larry Amerson was also at the scene. He identified a number of photographs of the victim's body and the general area. The body was badly cut. Both wrists were slashed and the victim's abdomen had been cut open. He pointed out small trees and shrubs that had been pushed over near the body.
Deputy Amerson also helped collect physical evidence at the scene, including a red bandana and two pairs of cotton panties found near the victim's head, the remains of the victim's blouse which had been cut, one tennis shoe that the victim was wearing and some buttons. He also collected other evidence near the body: a beer bottle, paper towels, a plastic paper towel wrapper, and a mattress pad. He also collected soil samples from underneath the victim's head and from the dirt roadway. This physical evidence was sent to the Birmingham labs.
According to the witness, it was about three or four miles from the highway to the dirt road leading to the crime site, and it took from three to five minutes to drive on the dirt road to the actual scene.
Deputy Amerson also testified that he collected blood and saliva samples from both appellant and Willie Towns. He found the mate to the victim's tennis shoe at the Towns residence on October 10 and the victim's pants in a storage area in Towns' *Page 1362 
yard on October 3. He also received a piece of the victim's blouse from Hobson City Policeman Cleotus Jones.
Finally, the witness collected a number of items belonging to appellant including carpet sweepings and samples, rags, a white blanket from appellant's car, a pair of pants, three shirts, the tennis shoes appellant was wearing the day the victim disappeared, appellant's pocket knife, and hair samples.
The witness also cut a section of tile from Towns' kitchen floor which had a bloodstain on it, and received a knife belonging to Towns.
Deputy Amerson did not notice any blood in the soil around the body, and he would expect to if the wounds had been made while the victim was still alive.
According to the witness, the investigation had narrowed the time of death to between 2:30 and 3:30 on the afternoon of September 30.
Dr. Joseph Embry, a forensic pathologist for the State of Alabama, performed the autopsy on the victim. He removed the remains of the victim's clothes which in his opinion had been cut.
According to Dr. Embry, there were three sets of deep knife type wounds in the abdomen. Both of the victim's wrists had been slashed. The wounds went through the tendons to the bone.
Dr. Embry believed that the wrist wounds were made after the victim had died because of the lack of bleeding. Conversely, he believed that the abdomen wounds were made before the victim was dead but while she was dying because of the amount of blood in her abdominal cavity. The victim had a high percentage of alcohol in her blood.
Dr. Embry stated that there was no single specific factor he could positively label as the cause of death. Because of the lack of any definite cause of death, along with the proximity of a mattress cover to the victim's head, he believed that the cause of death was asphyxia due to smothering, in association with sharp force or cuts to the abdomen. In his opinion, the victim did not die from alcohol abuse, but was the victim of a homicide.
Charles Windfrey, an investigator for the District Attorney's Office, took a second statement from appellant at appellant's home in the morning hours of October 3, the day after appellant gave his first statement and the day after the victim's body was found.
The second statement corresponded with the first statement, except appellant added that he, the victim, and the victim's mother briefly stopped by a neighbor's house on September 30, before stopping at the victim's house. He also added that after he left the victim in front of the Jackson Motel on September 30, he saw the victim stop and get into a yellow pickup truck. Two black males were in the truck. This occurred around 2:45 p.m.
After appellant gave the statement, he told Investigator Windfrey that he had a phone number of someone who might be able to give them the information as to who was in the truck. Appellant first searched his car for the number and then searched the yard to no avail.
Deputy Amerson was recalled to the stand. Deputy Amerson took another statement from appellant at 6:10 p.m. on October 3. This third statement corresponded with the early morning statement made to Investigator Windfrey.
Deputy Amerson again took appellant's statement at 4:45 p.m. on October 8. By this time, appellant was a suspect because of the City Clerk's identification as the caller giving the location of the victim's body.
After he was given his Miranda warnings, appellant basically gave the same story as he had given twice on October 3. He added that, after he saw the victim get into the yellow truck, he drove back to Mrs. Fluker's house, arriving around 2:00 p.m. He left there with his girl friend, Betty Joyce Wright, at 2:40 p.m. and went straight home where he remained the rest of the night. *Page 1363 
In the early morning hours of October 10, appellant gave a final statement in which he changed his story considerably from the time he let Carl Cooley off at his girl friend's house. Appellant told Deputy Amerson that instead of leaving the victim at the Jackson Motel on September 30, and seeing her for the last time there, he and the victim went to a liquor store and the victim bought a bottle of whiskey. While driving around town, the two of them drank the whiskey after the victim asked not to be taken home.
According to appellant, after drinking the whiskey, the victim coughed and she seemingly fell asleep. Appellant then drove up a dirt road and felt the victim's wrist for a pulse. After determining that she had no pulse, he took the body out of the car and shook it. He discovered that she had died, so he left the body on the side of the road near the rock quarry.
Appellant told Deputy Amerson that she was not cut nor unclothed when he left, but he was sure she was dead. He then admitted taking off her tennis shoes and her pants and throwing them in Willie Towns' yard. He also hung the portion of the blouse on Towns' fence. He did all of this to frame Towns with the murder of the victim.
Appellant then stated that he returned to the site the next day to discover the body unclothed and mutilated. The next morning, October 2, he drove to Anniston and called the Hobson City and Oxford authorities, telling them he was hunting near the rock quarry and found a body. He agreed to meet them near the body.
The witness then identified a number of exhibits which were introduced. He identified the remains of the clothing found on the victim, and he identified objects found near the body and he identified the portion of the blouse found hanging on Towns' fence that the appellant and the victim's relatives had given to Officer Cleotus Jones as well as the victim's pants found in Towns' back yard. He also identified the mate to the tennis shoe that the victim was wearing which he found in Towns' back yard after appellant had told him that he had thrown the shoe there. He further identified a pair of appellant's tennis shoes. Finally, he identified a paper towel from some 30 to 40 feet from the body in a roadway where cars had apparently pulled in and parked. The towels were nearer a trash pile than the body.
The witness further testified that there was a trail leading from the body to the roadway where it appeared vehicles had parked.
On cross-examination, the witness testified that he did not believe any fingerprints were detected on a beer bottle found leaning against the body.
John Case, a criminalist for the State of Alabama, was called to the stand. He was given the remains of the blouse found on the victim's body and the pieces of the blouse found in Towns' back yard. In his opinion, the two pieces appeared to match. He also testified that the tennis shoe found on the victim's body appeared to be the mate of the tennis shoe found in Towns' back yard.
During cross-examination, the witness testified that the mattress cover found near the body contained what appeared to be animal hairs, Negroid hairs, and Caucasian hairs. There were also red stains on the mattress covering. He also stated that he could not detect latent fingerprints on a candy wrapper and paper towel found near the body, nor did he detect the presence of any blood in a soil sample taken from beneath the victim's head.
The witness further testified that he compared "sweepings" from appellant's car with fibers on the mattress cover, and none matched. Neither did he find any of the fibers from appellant's car on any other of the physical evidence found near the body, including the victim's clothes.
The witness also received hair samples from the victim, appellant and Willie Towns. He could not make any hair comparisons with the mattress cover because of the fragmentary nature of the hair. As to the matching of the hair samples with hair *Page 1364 
found on the other physical evidence, because of the great similarity between the samples submitted and Negroid hair in general, it was often difficult to make a comparison. Thus, he could not make any conclusive match between hair samples submitted and Negroid hair found on the evidence. However, he did testify that a pubic hair found on a paper towel found near the body, which also had seminal fluid on it, was not similar to any of the three submitted hair samples.
Finally, the witness testified that he found no evidence of any bloodstains on the other items submitted to him, including appellant's shirt, a number of rags and a blanket from appellant's car, and appellant's pocket knife. He could not detect any latent fingerprints on the physical evidence found near the victim's body.
Jimmy Fluker, the victim's brother, was at his mother's house on Friday, October 2, when appellant and Betty Joyce Wright came by. They had just learned that the victim's body had been found. After about 10 to 20 minutes, he, his sisters, and appellant drove to the house of another sister, Shirley Dixon, arriving at about 4:00 p.m.
Around 4:30 p.m., Fluker rode with appellant and the victim's relatives to Towns' residence. Appellant was driving his car. While driving down an alley next to Towns' back yard, the witness saw a rag hanging on Towns' fence. When the witness got the rag off the fence, appellant identified the rag as a piece of the blouse the victim was wearing the day she disappeared. They then turned the blouse over to Officer Cleotus Jones.
Mary Ann Farrell, the victim's sister, lived behind her mother's house. Around dark on September 30, the day the victim disappeared, appellant came to her house to leave the clothes the victim had gotten from the Towns' residence when the victim moved out. The witness told appellant to leave the clothes at her mother's house. The witness was also in appellant's car when her brother spotted the remains of the victim's blouse on Towns' fence.
According to the witness, the appellant and Betty Joyce Wright came to her mother's house, which was adjacent to her mother's residence, about thirty minutes before they all went to Shirley Dixon's house on Friday, October 2. As far as she could determine, no one used her phone while at her house, and neither her mother nor Shirley Dixon had a phone.
During cross-examination, the witness stated that the victim and Towns had fought before. She also testified that there was nothing unusual about appellant's clothes when she saw him deliver the victim's clothes.
Officer Cleotus Jones testified that the victim's relatives had given him the remains of the victim's blouse that they had found at Towns' residence. Officer Jones gave the blouse to Deputy Amerson.
Clarence Royal, Jr., also saw appellant the day the victim disappeared. According to the witness, appellant stopped at the witness's residence around 1:30 to 2:00 p.m. and asked to borrow a rag to remove stuff from the carpet in his car. Appellant wetted a towel and wiped off the front seat, front door, and the back seat on the passenger's side. Appellant also wiped his tennis shoes. The witness identified two tennis shoes as the shoes appellant had on that day.
Appellant told the witness that he had taken the victim to find an apartment on 12th Street. Appellant also said that he had come from "off the hill," which was in the direction of the rock quarry.
On cross-examination, the witness testified that he did not see any blood in the car when he got a cigarette from the dash of the appellant's car.
The state's next witness was Kevin Noppinger, a serologist for the state. Mr. Noppinger received blood samples from the victim, appellant, and Willie Towns.
The witness testified that about 80 percent of the populace secreted their blood type into their bodily fluids, hence they are labeled "secretors." The other 20 percent do not, and are labeled "non-secretors." He *Page 1365 
tested Willie Towns and appellant and determined that Towns was a "secretor" while appellant was a "non-secretor." The witness tested seminal fluid found on the green paper towels which were near the body and determined that the semen came from a "non-secretor." He also detected the presence of seminal fluid in a vaginal slide taken from the victim's body.
After typing the blood samples of appellant, Towns, and the victim, he determined that the appellant and the victim had identical blood types, while Towns' was of a different blood type.
Mr. Noppinger then made a blood analysis on various items to see if there was a match. The witness first typed blood found on the two pieces of the victim's blouse. The blood type matched the blood of appellant and the victim, but not of Towns.
After analyzing blood found on the victim's pants, he determined that the blood was human blood but he could not type the blood.
The witness also typed blood found under the victim's fingernails which matched appellant's and the victim's blood but was inconsistent with Towns' blood type.
An analysis of the appellant's tennis shoes he was wearing the day the victim disappeared showed that there was blood on one of the shoes, but the witness could not determine whether the blood was human or animal.
Finally, Mr. Noppinger analyzed stains found on Towns' kitchen floor as blood stains which matched appellant's and the victim's blood type but were inconsistent with Towns' blood type.
During cross-examination, the witness testified that he had typed blood found on Towns' clothes and that the blood was consistent with Towns' own blood type. He found no blood on appellant's clothes, knife and towels which were submitted to him. He did find blood on a towel found in Towns' kitchen but was unable to type the blood. Also, in the witness's opinion, the victim had had intercourse within approximately 48 hours of when the body was found.
On redirect examination, the witness stated that generally a normal wash will wash any bloodstains from clothes.
Officer Richard Townsley of the Anniston Police Department testified that he found the victim's pants on a box underneath a shed in Towns' back yard. He also cut the piece of tile from Towns' kitchen floor. According to the witness, the tile was covered with dirt and the stain appeared to be old. He also identified the towel he got from Towns' kitchen.
Mrs. Ruby Fluker, the victim's mother, testified that she and appellant picked up the victim in front of the food stamp office the day the victim disappeared. She last saw the victim with appellant. The appellant returned around dark that night with the victim's clothes, stating that the victim instructed him to give them to her.
The day the victim disappeared, she heard Towns threaten to kill the victim if she returned to his house.
After the state rested, appellant called Shirley Ann Dixon, the victim's sister, to the stand. Mrs. Dixon had seen appellant at her house on the afternoons of September 30, October 1, and October 2. According to the witness, on Friday, October 2, her sister, brother, and the appellant came by between 4:30 and 5:00 p.m. and told her that her sister's body had been found.
Although her testimony was somewhat confusing she also testified on direct and again on redirect examination that, while appellant and Betty Joyce Wright were at her house on the afternoon of Friday, October 2, appellant had left walking, telling them he was going to a local store.
The witness then testified that she and her relatives and appellant had ridden by Towns' residence the day the victim disappeared. She testified that it was appellant's idea to ride down the alley besides Towns' residence when the blouse was found on the fence. She also testified that, on each of three days she saw appellant *Page 1366 
before the victim's body was found, he would ask if she had seen the victim.
Betty Joyce Wright, the victim's sister and appellant's girl friend, testified that she saw appellant leave at 9:00 a.m. the day the victim disappeared. She also saw him when he, the victim and her mother stopped at a neighbor's house around 12:00. She did not see him again until 4:00 p.m. that day. On the day the body was found, appellant left home at 8:00 a.m., telling her he was going to look for a job. He returned at 9:00 a.m.
According to Mrs. Wright, she and appellant went to her sister Shirley Dixon around 10:30 a.m. that day. She seemed to indicate that appellant had walked to a store while they were at her sister's house some time later.
During cross-examination, the witness testified that appellant asked her to wash his car and a car mat. She also stated that she had just washed appellant's clothes when the police collected them from her.
Mary Thomas was with the victim and Towns at a bar a few years earlier. According to the witness, Towns claimed that someone had stolen some money from him and began accusing the victim. After the victim refused to allow Towns to search her, he threw a meat cleaver at her. She also testified that two months previously he had pushed the victim against a car.
During cross-examination the witness admitted dating appellant for one to two years and that she had been convicted of theft and arson.
Appellant's last witness was Evelyn Denton. Mrs. Denton testified that she saw the victim around 2:00 p.m., fighting, either on the day the victim disappeared or the day before. The witness, after reviewing the statement she made, testified that the date on the statement was September 30, the day the victim disappeared.
However, during cross-examination she testified that the event could have just as easily occurred on September 29 as on September 30.
On redirect examination, she testified that the victim was wearing blue pants the day she disappeared, as well as a flowered blouse and a red bandana. She identified the red bandana in evidence as the one the victim was wearing on that day.
Appellant first argues that the trial court erred in denying his motion to exclude the state's evidence.
Much of this case involves circumstantial evidence. In reviewing a conviction based on circumstantial evidence, this court will view the evidence in the light most favorable to the state. The test to be applied is "whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Dolvin v. State, Ala.,391 So.2d 133 (1980); Cumbo v. State, Ala.Cr.App., 368 So.2d 871, cert. denied, Ala., 368 So.2d 877 (1978).
We believe that the evidence, when viewed in the light most favorable to the state, was sufficient to allow the jury to reasonably conclude that the evidence excluded any reasonable hypothesis except that of guilt.
We agree with appellant that incriminating circumstantial physical evidence found at the scene of the crime was weak to nonexistent. Although blood analysis of the victim's clothes and finger scrappings was consistent with appellant's blood type, the victim had an identical blood type. The evidence technician was unable to detect any latent fingerprints on various objects found at the scene. The evidence tends to indicate that the body was dragged from a nearby roadway to where cars had apparently parked at the scene after the victim was murdered. No one noticed any blood on the ground near the body; small bushes were flattened in the general vicinity, and there was testimony of a trail leading to the body. There was no fiber or hair evidence linking appellant or his car with the mattress pad found next to the body or the body itself. The only evidence found at the scene linking the appellant to the crime was testimony that seminal fluid found on a *Page 1367 
paper towel near the body was from a "non-secretor" and appellant was a "non-secretor." However, this evidence was offset by subsequent testimony that a pubic hair found on the paper towel was not similar to samples of the victim's, appellant's or Willie Towns' hair. About the only reasonable inference to be drawn from the evidence was that neither did it implicate Willie Towns.
Neither were incriminating bloodstains found on appellant's shirt and pants and pocket knives. Again, the same can be said of Willie Towns, except for apparently old bloodstains found at the residence he and the victim lived in which were compatible with the victim's blood type.
However flimsy and conflicting the evidence may be, we are faced with appellant's highly incriminating statements along with incriminating evidence surrounding that statement. After giving numerous statements that he had last seen the victim alive in West Anniston, appellant finally admitted leaving the body where it was found. He stated that the victim was dead. He admitted removing articles of clothing that day from the body and placing them in Willie Towns' back yard where they were subsequently found. Although he denied cutting the victim, the portion of the blouse that he hung on Towns' fence was stained with blood consistent with her blood type along with her blood soaked pants and her tennis shoe. This certainly gave rise to a legitimate inference that he removed her blouse after she was cut. He admitted calling authorities two days later, describing himself as a hunter who had run across the body, and he admitted he was attempting to frame Towns by placing the victim's clothing in Towns' yard.
Besides this statement, there was corroborating testimony that appellant, using a pseudonym, had called the Hobson City authorities two days after the victim had disappeared, describing the location of the body. There was corroborating testimony that the victim's bloodstained clothes were found where appellant had stopped at a friend's house the afternoon the victim disappeared, telling the friend that he had come from "off the hill" which was in the direction of the rock quarry. After appellant asked for a rag to wipe out his car, he wiped off his tennis shoes. An analysis of the shoes determined the presence of blood.
This court must take the evidence favorable to the prosecution as true and accord to the state all legitimate inferences therefrom. Bozeman v. State, Ala.Cr.App.,401 So.2d 167, cert. denied, Ala., 401 So.2d 171 (1981). Reasonable inferences from the evidence may furnish a basis for proof beyond a reasonable doubt. Hayes v. State, Ala.Cr.App.,395 So.2d 127, cert. denied, Ala., 395 So.2d 150 (1981).
We believe that the jury drew a reasonable and legitimate inference from appellant's final statement and related circumstances that he was guilty beyond a reasonable doubt. The evidence was sufficient to sustain the verdict.
Appellant next argues that the trial court erred in allowing Diana Houston to identify appellant as the caller reporting the location of the body and identifying himself as "Robert Miller." Appellant contends that the witness had no proper basis in which to identify the caller.
On October 2, 1981, the witness talked to the caller who identified himself as "Robert Miller" and gave directions to the body. Six days later, as she was monitoring the telephone calls on a City phone, she testified that she recognized the voice of "Robert Miller" on one of the lines. When she looked up, she saw appellant talking on that particular line.
Contrary to appellant's assertion, we believe that the trial court properly allowed into evidence the voice identification.
This court has held:
 "Generally, testimony by a witness that he recognized the accused by his voice is admissible in evidence, provided only that the witness has some basis for comparison of the accused's voice with the voice which he identifies as that of the accused. Orr v. State, 225 Ala. 642, 144 So. 867 (1932); Hall v. State, 208 Ala. 199, *Page 1368 94 So. 59 (1922); Shaffer v. State, 202 Ala. 243, 80 So. 81
(1918); McGraw v. State, 34 Ala. App. 43, 36 So.2d 559
(1948); Kirby v. State, 16 Ala. App. 467, 79 So. 141
(1918). There is a sufficient basis for comparison of voices even if the witness acquires his knowledge of the accused's voice after the event testified to by the witness. Stemple [v. State, 352 So.2d 33 (1977)], supra; McGraw, supra." [Emphasis added.] Odom v. State, 356 So.2d 242 (1978).
Appellant correctly states that a witness may identify the voice as that of the accused if he has had a subsequent face-to-face conversation with the accused. McGraw v. State,34 Ala. App. 43, 36 So.2d 559 (1948). However, McGraw, supra, did not hold that this was the only means. We believe that hearing appellant's voice on the telephone subsequent to the first conversation coupled with seeing appellant while he used the telephone provides the required basis for comparison. We do not see how this situation substantially differs from a subsequent face-to-face conversation. If anything, hearing appellant's voice over the telephone subsequent to the conversation would be more reliable.
Any distortion caused by the electronic transmission of the voice over the telephone would possibly be present in both conversations whereas such possible distortion would not be present in a face-to-face conversation.
In any event, the trial court properly allowed the voice identification into evidence. Taylor v. State, 75 Ga. App. 205,42 S.E.2d 926 (1947).
Moreover, even if allowing this testimony was error, any error was rendered harmless by the subsequent introduction of appellant's statement in which he admitted calling the Hobson City authorities on October 2 and stating he had found the body while hunting. Although in the statement he told Officer Amerson he called in the morning of Friday, October 2, and Mrs. Houston testified that "Robert Miller" called in the afternoon of that day, apparently this was the same phone call. The issue is further clouded by the somewhat confusing testimony of the victim's relatives as to appellant's action that afternoon, although there was testimony that appellant had left Shirley Dixon's house some time that afternoon and had walked to a local store. In any event, the incriminating nature of Mrs. Houston's testimony was that appellant called the authorities two days after the body was found, giving the location of the body without ever subsequently informing them that he was the caller or had any knowledge as to her whereabouts.
Our Supreme Court has held that testimony apparently illegal may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred. Yelton v. State, 294 Ala. 340, 317 So.2d 331
(1974).
Appellant also argues that his inculpatory statement made to the police in which he changed his story and admitted leaving the victim's body at the rock quarry and attempting to frame Willie Towns may have been the result of an illegal detention and the trial court erred in not allowing him to question the validity of the detention.
It appears from the record that, on the night of October 9, 1981, appellant was asked to make a statement concerning the present case. At 11:14 p.m., appellant made a statement at the Hobson City Police Department basically sticking with his original story that he had left the victim at a local motel. Appellant was given his Miranda warnings and he signed a waiver form. Appellant was not in custody nor was he in any way officially detained when he made the 11:14 statement.
Around midnight, the police received verbal telephone confirmation of an earlier teletype message that appellant was wanted for a separate and unrelated murder in California and that an arrest warrant charging appellant with the murder had been issued in California. Based on this information, appellant was arrested for this unrelated charge and given his Miranda
warnings. Subsequent to this arrest, around 12:45 a.m., October 10, appellant indicated that he wished to make another *Page 1369 
statement concerning the present case. He was again advised of his rights and signed a waiver form. In the 12:45 statement, appellant admitted leaving the body, calling the Clerk's Office to report the location of the body and attempting to frame Willie Towns.
During the suppression hearing, appellant questioned the policeman who took the two statements and requested that he produce the arrest warrant based on the California charge. The trial court refused the request and did not allow appellant to further inquire about the California charge. We believe that the trial court did not err in doing so because the issue of appellant's arrest on a separate charge did not affect his subsequent statement concerning the case.
The Supreme Court in Brown v. Illinois, 422 U.S. 590,95 S.Ct. 2254, 45 L.Ed. 416 (1975) identified the relevant inquiry in determining whether an illegal arrest would improperly taint a subsequent confession as being whether the statements were obtained by exploitation of the illegality of the arrest. An especially important factor in determining the issue is the purpose and flagrancy of the possible official misconduct.
There was no exploitation of any prior illegal police conduct in the attainment of appellant's statement. Appellant was arrested for independent and non-investigatory reasons, i.e., the California murder charge. This arrest had nothing to do with the subsequent statement concerning this case, and was obviously not made in order to produce a subsequent statement in the present case. Neither was any possible technical illegality concerning the California charge in any way the result of flagrant official misconduct concerning the present case.
We hold that the relationship between the detention of appellant on wholly unrelated charges and the subsequent statement concerning the present case is sufficiently attenuated to render the statement admissible and no deterrent purpose is served by applying the exclusionary rule in these circumstances. State v. Osbond, 128 Ariz. 76, 623 P.2d 1232
(1981).
Moreover, assuming arguendo that the arrest was relevant, the arrest was lawful. It appears from the record that appellant was initially arrested based only on the teletype information and subsequent verbal confirmation of an outstanding arrest warrant in California. Subsequent to the arrest and the second statement the arrest warrant based on the California charge was obtained. The Code of Alabama allows a warrantless arrest whenever someone has "reasonable information" that an accused stands charged with a crime punishable by death or life imprisonment. § 15-9-42, Code of Alabama 1975. All degrees of murder in California carry a possible life sentence. Cal. [Penal Code] Tit. 8 § 189 (West 1968). Thus, the arrest was legal, rendering any subsequent statement admissible.
Appellant's last contention is that the trial court erred in allowing into evidence a number of Georgia records of prior felony conviction during appellant's sentencing hearing.
After giving adequate notice, the prosecution introduced six documents purporting to show six prior felony convictions of appellant in Georgia. The trial court allowed the records into evidence and sentenced appellant to life without parole under §13A-5-9 of the Habitual Offender Act. Under this section, when it is shown that a defendant has been convicted of three prior felonies, on conviction of a fourth Class A felony, he must be sentenced to life imprisonment without parole.
Appellant argues in his brief four alleged defects in the state's manner of proof of the prior convictions: (1) a number of the documents do not establish that appellant was represented by counsel when convicted of the prior offense as required under Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258,19 L.Ed.2d 319 (1967), (2) it was not adequately shown that the named defendant on each document was the same person as appellant, (3) in allowing the introduction of only the Georgia public records, appellant was denied *Page 1370 
his right to cross-examination and confrontation of witness, and (4) the records were not properly certified.
There is no merit to any of the four grounds.
We first note that although records of six prior convictions were introduced under § 13A-5-9 (c)(3) only three prior convictions must be properly proven. Any possible error in accepting into evidence additional prior convictions which were improperly proven is harmless error. Watson v. State, Ala.Cr.App. 392 So.2d 1274 (1981). The state properly proved at least three prior convictions.
As to appellant's first asserted ground of error, although one out of the six documents is questionable, state's exhibits 1, 4 and 6 all contain the signature of counsel who represented the appellant.
As to the second ground, appellant specifically argues that because a number of the documents list "Edward Favors" without "Jr.", the state did not adequately show that appellant was the same as the person listed. However, both state's exhibits 1 and 6 list the defendant as "Edward Favors, Jr." State's Exhibit 4 lists the defendant as "Edward Jett Favors." "Jett" is appellant's middle name.
The word "Jr." is ordinarily a matter of description and is no part of a person's legal name. Taylor v. State, 282 Ala. 567, 213 So.2d 566, cert. denied 393 U.S. 1102, 89 S.Ct. 903,21 L.Ed.2d 795 (1969). We note that even on the documents listing the defendant as "Edward Favors, Jr." the defendant did not use the description "Jr."
This court in Williams v. State, 364 So.2d 717 (1978) held that the identity of the name raises the presumption of sameness of person. We note that in the present case as inWilliams, supra, appellant introduced no evidence to rebut this presumption of sameness of person.
Appellant did not raise at his sentencing hearing the specific objections he argues in the third and fourth grounds in his brief. The trial court will not be placed in error for these grounds on appeal that were not specified during the sentencing hearing. Smith v. State, Ala.Cr.App., 409 So.2d 455
(1981).
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.