728 So.2d 172 (1998)
Ex parte William David SCOTT.
(Re William David Scott v. State).
1961460.
Supreme Court of Alabama.
March 20, 1998.
Rehearing Denied January 15, 1999.
*174 John Knowles, Geneva, for petitioner.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for respondent.
COOK, Justice.[*]
William David Scott was convicted of theft of property and of murder made capital because *175 it was committed during a burglary (§ 13A-5-40(a)(4), Ala.Code 1975) and was committed for a pecuniary consideration (§ 13A-5-40(a)(7)). The jury, voting 12-0, recommended that for the murder Scott be sentenced to life imprisonment without the possibility of parole. The trial judge overrode the jury's recommendation and sentenced Scott to death. The Court of Criminal Appeals affirmed the murder conviction and the sentence of death. Scott v. State, 728 So.2d 164 (Ala.Cr.App.1997). We have granted certiorari review as to the murder conviction. We affirm.
The Court of Criminal Appeals, in its opinion of January 17, 1997, set forth the following set of facts:
"The record indicates that during the late evening hours of July 10, 1993, or the early morning hours of July 11, 1993, J.W. Griffin was killed at his home in Geneva. The victim's son, Greg Griffin, found his father dead on the morning of July 11, 1993. Griffin's hands were down by his side and his pants were unzipped. He had been shot once above the right eye and once in the center of the back. The State presented evidence that all of the doors to Griffin's mobile home were shut and his car was parked in the front yard. A chair with a footprint on it was found at an exterior bedroom window and the screen was lying on the ground. It appeared that the assailant had entered the mobile home through the window. There was no sign of a struggle.
"James Linder, a friend and coworker of the appellant's, testified that, on June 17, 1993, he accompanied the appellant on what was to be a trip from Ocala, Florida, to a possible construction job. The appellant's car, however, broke down in Lake City, Florida. Linder testified that the appellant called an acquaintance, Jim Fletcher, who came and picked them up and took them to Ocala. The following day Linder and the appellant drove to Geneva, Alabama, in Jim Fletcher's truck. Linder testified that it was during this trip that the appellant told him that the purpose of the trip was to kill Griffin. The appellant offered to pay Linder $300 if Linder would drive him. The appellant also told Linder that there would be future jobs involving much larger compensation if this one went well. Upon arriving in Geneva, the two were unable to locate Griffin at either his residence or his place of business, which was a produce stand. They spent two nights in Geneva and then returned to Florida. Linder testified that on July 10, 1993, he and the appellant returned to Geneva. According to Linder, the appellant had a revolver in his possession. Linder dropped the appellant off at a vacant lot near Griffin's mobile home. The plan was for the appellant to go to Griffin's home, kill him, and return to the truck, where Linder would be waiting to drive him back to Florida. Linder testified that from where he was waiting, he could see people attending a pool party. He testified that after several minutes had passed, a man, later identified as Al Danner, approached him and asked him what he was doing there. He testified that shortly thereafter, police officers arrived and questioned him. Linder told the officers that he had lost his identification, and he gave the name and birthdate of a friend, Albert Faulk, as his own. Linder testified that, after the officers instructed him to move on, he pulled into a nearby gasoline station, purchased a soft drink, and proceeded to Panama City, Florida, where he spent the night.
"That night, Linder telephoned Jim Fletcher, who instructed him to meet the appellant at the Greyhound bus station in Panama City the next morning. Linder testified that, while at the bus station, the appellant told him that `it's not like on TV' and `peoplethey don't grunt when they go down.' The appellant told Linder that he had crawled through a window and that he shot Griffin twice. Linder testified that the appellant told him that Jim Fletcher had wired money to him in Panama City but that he was unable to find a Western Union Telegraph Company outlet that was open for business. Linder, however, found *176 a Western Union store and when the appellant returned to Ocala he was to send Linder a portion of the original transfer from Fletcher. Linder testified that he received the money and then returned to Oklawaha, Florida. There, Linder was instructed by Fletcher to get rid of the truck. He testified that he took the truck into a wooded area and burned it. Linder did not see the truck again until he and the appellant went to the area to show the truck to Ronnie Thomas, a mechanic, who was interested in buying the truck.
"Jim Fletcher testified that he was a resident of Oklawaha and that he had known the appellant for several years. He testified that a man named Jesse Richburg[[**]] had approached him about killing J.W. Griffin. Fletcher said that he did not do anything like that and referred Richburg to the appellant. He testified that, during the early months of 1993, the appellant informed him that he had accepted the `job' and would receive $5,000. Fletcher testified that on June 9, 1993, the appellant drove his truck to Geneva to `scout the job out.' He had to wire $100 to the appellant in Panama City so that he could afford to return to Geneva. Fletcher testified that he became aware that the appellant had attempted a second trip to Geneva when the appellant called him requesting help because his car had broken down in Lake City, Florida. Fletcher drove to Lake City and transported the appellant and James Linder back to Oklawaha. Fletcher testified that the following morning the appellant told him that he and Linder would be taking Fletcher's truck to Geneva to kill Griffin. Two days later, the appellant telephoned Fletcher from Panama City stating that he and Linder had been unable to locate the victim and that he needed him to wire $100 so that they could return home.
"Fletcher testified that, shortly thereafter, he obtained a `throw away' gun from Richburg and passed it on to the appellant. Fletcher testified that, on the weekend of July 10, 1993, he received a telephone call from the appellant. The appellant instructed him to call a certain number and say the following: `Listen, I'm only going to say this one time. It's done, it came out dirty, I'm going to need more money and I'll see you tomorrow.' The appellant also stated that he and Linder had gotten separated and that he asked Fletcher to wire him $300. Fletcher testified that he complied with the appellant's requests. Approximately three hours later, Fletcher received a telephone call from the appellant's ex-wife, who asked him for $50 so that she could purchase a bus ticket from Panama City to Ocala for the appellant. The ticket was wired from Ocala to Panama City, where the appellant signed for it. Fletcher testified that he saw the appellant on Monday. The appellant told him that he had climbed into Griffin's mobile home through a window and shot him twice. The appellant told him that Griffin had been lying on the couch and when he got up to go to the bathroom, he shot him.
"Rita Boyette testified that she lived approximately one mile from Griffin's mobile home. She testified that, on the night of the murder, her 1983 Ford LTD automobile was stolen from her carport. The abandoned car was found at a construction site in Panama City, Florida, by an officer of the Panama City Police Department. The State presented evidence that fingerprints and palm prints discovered in the automobile matched those of the appellant.
"Blanche Kay Klapper, a friend of the appellant and Linder, testified that the appellant asked her to keep his son on the weekend of July 10 because he `had a job to do.' The following Monday she picked the appellant up at a convenience store. She and the appellant left the store and went to Jim Fletcher's house, at the appellant's request. On the way, the appellant told her that `he could be looking at facing the [penitentiary] or maybe the [electric] chair because somebody was killed.' Klapper testified that she then told the appellant that she did not want to hear any *177 more. She testified that, after she and the appellant arrived at Fletcher's house, the appellant and Fletcher had a conversation, which she did not hear.
"Jimmy Hand, an investigator with the district attorney's office in Dale and Geneva Counties, testified that Griffin had been involved as an informant in a federal investigation involving Jesse Richburg. He testified that Griffin's ex-wife, Rhonda Bohannon, knew that Griffin was an informant. He testified that Bohannon and Richburg had been seen together before and after Griffin's death."
728 So.2d at 165-166. The Court of Criminal Appeals addressed the following six arguments in its opinion:
I. "[That] the trial court erred in allowing the jury to consider the uncorroborated testimony of [Scott's] accomplices, Jim Fletcher and James Linder, in violation of § 12-21-222, [Ala.Code 1975]." See 728 So.2d at 166.
II. "[That] the trial court erred in refusing to give 14 of [Scott's] 34 requested charges during the guilt phase of his trial." See 728 So.2d at 169.
III. "[That] there was insufficient evidence presented by the State to support [Scott's] conviction for capital murder and his sentence of death." See 728 So.2d at 169.
IV. "[That] the trial court's decision to override the jury's recommendation of life imprisonment without parole and to sentence him to death was not supported by either the evidence or the law." See 728 So.2d at 171.
V. "[That] the Alabama statutory scheme that allows the trial court to override the advisory verdict of the jury violates [Scott's] constitutional rights because, he says, it results in a random, arbitrary imposition of the death penalty." See 728 So.2d at 171.
VI. "[That] the death penalty constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution." See 728 So.2d at 171.
Scott makes these arguments and 21 more on this certiorari review. We have combined some of Scott's arguments for discussion purposes in this opinion. Not all of the arguments raised by Scott will be discussed in this opinion.

I.
Scott contends that the only testimony at trial connecting him to the murder was the testimony of two accomplices to the crime, James Linder and James Fletcher. He argues that their testimony was not corroborated by any other evidence at trial. Section 12-21-222, Ala.Code 1975, states:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."[1]
The Court of Criminal Appeals has written:
"`The test for determining the sufficiency of the corroborative evidence ... is through a "subtraction process". Thompson v. State, 374 So.2d 388, 389 (Ala.1979), citing Kimmons v. State, 343 So.2d 542 (Ala.Cr.App.1977). The test is generally stated:
"`"[F]irst, the evidence of the accomplice must be eliminated, and then, if upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration...." Miller v. State, 290 Ala. 248, 250, 275 So.2d 675 (1973)....
"`This rule is codified in Alabama Code 1975, Section 12-21-222.'

*178 McCoy v. State, 397 So.2d 577, 585 (Ala.Cr. App.), cert. denied, 397 So.2d 589 (Ala. 1981). [Emphasis added in McCoy.]
"`"The corroboration which is sufficient to support the accomplices' testimony must be of some fact tending to prove the guilt of the defendant.
"`"`... It must be of a substantive character, must be inconsistent with the innocence of the accused and must do more than raise a suspicion of guilt....' Sorrell v. State, 249 Ala. 292, 31 So.2d 82, 83."'

Ex parte Bell, 475 So.2d 609, 613 (Ala. 1985). See also Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr.App.1985). `"[E]vidence which merely raises a conjecture, surmise, speculation, or suspicion that [the] accused is the guilty person is not ... sufficiently corroborative of the testimony of an accomplice to warrant a conviction." 23 C.J.S. Criminal Law, Section 812(5)(b).' Staton v. State, 397 So.2d 227, 232 (Ala.Cr. App.1981)."
Steele v. State, 512 So.2d 142, 143-44 (Ala. Crim.App.1987). See also Herring v. State, 540 So.2d 795, 799 (Ala.Cr.App.1988).
This Court has defined the verb "to corroborate," in the context of § 12-21-222.
"To corroborate means to make more certain, to confirm, or to strengthen. Lewis v. State, 426 So.2d 932 (Ala.Cr.App. 1982), cert. denied, 426 So.2d 938 (Ala. 1983), and the corroborative testimony need not be strong or sufficient in and of itself to support a conviction. Andrews v. State, 370 So.2d 320 (Ala.Cr.App.1979), cert. denied, 370 So.2d 323 (Ala.1979). Corroborative evidence need not directly convict the accused of the crime, but need only tend to do so. Id."
Ex parte Bankhead, 585 So.2d 112, 119 (Ala. 1991). See also Hergott v. State, 639 So.2d 571, 573 (Ala.Cr.App.1993).
If the testimony of the accomplices, Linder and Fletcher, is eliminated, the following evidence remains: The testimony of Rita Boyette, whose car was stolen on the night of the murder and, upon recovery, had the defendant's fingerprints in it; Naomi Stevens's testimony that she was employed at a produce stand owned and operated by Griffin and that approximately one week before the murder Scott had inquired of her as to the whereabouts of J.W. Griffin;[2] and the testimony of Blanche Kay Klapper, a friend of Scott's, who indicated that he confided to her upon his return to Ocala, from "a job," that he could be "looking at facing the [penitentiary] or maybe the [electric] chair because somebody was killed." Scott v. State, 728 So.2d at 166.
The testimony of Rita Boyette and the prints found in her car placed Scott, who was from Florida, very near the scene of the crime on the night it occurred.
"The accused's proximity to the crime is a relevant consideration when determining whether sufficient corroboration of the accomplice's testimony exists. [Andrews v. State, 370 So.2d 320 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979).] However, the accused's proximity itself, in most cases, is not enough evidence for corroboration. `If, however, the accused is in close proximity to the crime and there is other evidence indicating guilt, such a combination of evidence is sufficient to corroborate the testimony of an accomplice.' C. Gamble, McElroy's Alabama Evidence § 300.01(14) (4th ed.1991)."
Chevere v. State, 607 So.2d 361, 366 (Ala.Cr. App.1992). Considered together, Ms. Boyette's testimony placing the defendant near the crime scene, Ms. Stevens's testimony that the defendant had inquired regarding Griffin's whereabouts, and Ms. Klapper's testimony that the defendant had confided to her when he returned to Ocala that he could be "looking at facing the pen or maybe the chair because somebody was killed," Scott v. State, 728 So.2d at 166, the evidence remaining after we subtract the accomplices' testimony tended to connect Scott with the murder of Griffin.
"`"[C]orroborative evidence need not refer to any statement or fact testified to by the *179 accomplice. Neither must it be strong [or] sufficient of itself to support a conviction. The probative value of the evidence need only legitimately tend to connect the accused with the crime and [it] need not directly do so."'"
Chevere v. State, 607 So.2d 361, 365 (Ala.Cr. App.1992).

II.
The defendant next argues that the trial court did not adequately instruct the jury that neither Linder's testimony nor Fletcher's testimony could be used to corroborate the testimony given by the other. We conclude that the jury instructions were not erroneous.
"In review of a trial court's jury charge, individual instructions are not to be isolated or taken out of context, but must be considered in light of all the instructions. Ex parte Holifield, 562 So.2d 254, 255 (Ala. 1990); Alexander v. State, 601 So.2d 1130, 1133 (Ala.Crim.App.1992)."
Ex parte Musgrove, 638 So.2d 1360, 1365 (Ala.1993). The entire instruction to the jury on the question of accomplice testimony was as follows:
"In this case we have two witnesses who would be classified as accomplices and they were Mr. Linder and Mr. Fletcher. An accomplice is defined to be an associate in crime or a partner or a partaker in guilt. An accomplice is one who is in some way concerned with the commission of a crime. Whether a witness is an accomplice is a question of fact to be determined by the jury where there is a conflict in the evidence on the question.
"A conviction for a felony offense cannot be had on the testimony of an accomplice, or numerous accomplices, unless such testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense. The rule is that for such other evidence to be sufficient, it must be believed by the jury beyond a reasonable doubt. If such evidence merely shows the commission of the offense or the circumstances thereof, without connecting the defendant with the commission of the offense, such other evidence is not to be sufficient and the defendant could not be convicted.
"If the jury is not satisfied beyond a reasonable doubt of the truth of some of this evidence tending to prove the defendant's guilty connection with the charged felonies, other than the testimony of Mr. Linder or Mr. Fletcher, the jury could not find the defendant guilty.

"A conviction of a felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense and such evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.

"The test for determining sufficiency of evidence to corroborate testimony of an accomplice is a subtraction process. First, the testimony of the accomplice must be eliminated, and then if upon an examination of all of the other evidence there is sufficient evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration.
"The corroboration necessary to support the testimony of an accomplice must be some fact tending to prove the guilt of the accused. It is not sufficient if it is equivocible [sic] or uncertain in character, and must be such that it legitimately tends to connect the defendant with the crime. It must be of a substantive character, it must be consistent with the innocence of the accusedit must be inconsistent with the innocence of the accused and must do more than raise a suspicion of guilt.
"Suspicious conduct on the part of the defendant is not in itself sufficient corroboration of an accomplice's testimony.
"Speculation and suspicion will not support a conviction based on the uncorroborated testimony of an accomplice.
"The testimony of an accomplice remains in limbo as no evidence at all until it is corroborated by other evidence tending to incriminate the accused."
R.T. at 902-05. Scott claims that the jury was misled to believe that Linder's testimony could be used to corroborate Fletcher's testimony *180 and vice versa. However, the trial judge specifically charged the jury as follows:
"If the jury is not satisfied beyond a reasonable doubt of the truth of some of this evidence tending to prove the defendant's guilty connection with the charged felonies, other than the testimony of Mr. Linder or Mr. Fletcher, the jury could not find the Defendant guilty.

R.T. at 903-04. We find no error in these instructions.

III.
The defendant next contends that the State used the testimony of Officer Jimmy Hand to provide the "reason" the murder occurred. Most of Hand's testimony, according to the defendant, constituted hearsay and should not have been admitted into evidence. Hand's testimony provided the jury the following information surrounding the murder: J.W. Griffin, the victim, had been an informant in an investigation of Jesse Richburg. In addition, Griffin's former wife, Rhonda Bohannan, was romantically involved with Richburg, and a dispute had arisen as to the paternity of Bohannan's child. Finally, Hand's testimony indicated that Ms. Bohannan knew that Griffin had been informing on Richburg.
Jimmy Hand, who, in addition to being an investigator, was Griffin's nephew, testified at trial regarding Ms. Bohannan's marriage to Griffin and their subsequent divorce. During questioning, the defendant objected to questions asked by the prosecution regarding a paternity dispute involving Bohannan's child. These objections were sustained; therefore, as to these questions there is nothing for this Court to review. Weaver v. State, 682 So.2d 488, 492 (Ala.Cr.App. 1996).
Next, the defendant argues that the trial court erred in allowing Hand to testify as follows:
"Q. And is it fair to say that J.W. Griffin, your uncle, was acting astrying to be an informant against Jesse Richburg?
"A. That is correct.
"Q. Without asking you what he told you, was he attempting to provide you incriminating information against Mr. Richburg?
"A. Yes, sir.
". . . .
"Q. After J.W. was an informant against Mr. Richburg in that investigation, did Rhonda Bohannan know that?
"A. Yes, she did.
"Q. Since the time of Mr. Griffin's death, have you seen Rhonda Bohannan and Jesse Richburg together?
"A. Yes, I have.
"Q. And at the approximate time of his death, did you see them together?
"A. I seen them prior to his death and since his death together."
R.T. at 769-71. Scott did not object to Hand's testimony.
"`While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106] at 1111 [(Ala.1985)] (emphasis in original). `This court has concluded that the failure to object to improper prosecutorial arguments... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). `Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See also Biddie v. State, 516 So.2d 837 (Ala.Cr. App.1986), reversed on other grounds, 516 So.2d 846 (Ala.1987)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr. App.1990). While it was error for Hand to testify as to the thought processes of Bohannan, i.e., that Bohannan "knew" Griffin was informing on Richburg (see Dyson v. State, 591 So.2d 559, 563 (Ala.Cr.App.1991)), the *181 entire transcript of the testimony from Hand, who said he had seen Bohannan with Richburg before Griffin's death, as well as afterwards, indicates that Hand had inferred her knowledge from the other facts as to which he testified. Any error in this regard, therefore, did not rise to the level of plain error.

IV.
Scott contends that the two counts alleging capital murder were improperly joined with the theft count. He argues that the capital counts and the theft count were not of the same character or of a similar character, that they were not based on the same conduct, and that they could not have been properly consolidated as related to parts of a common plan or scheme. See Rule 13.3(a), Ala.R.Crim.P.; Yelder v. State, 630 So.2d 92, 95-96 (Ala.Cr.App.1991). He submits that geography is the only factor connecting the two crimes and that, because of the joinder, he was forced to concede the theft. We disagree.
"In Yelder v. State, 630 So.2d 92 (Ala.Cr. App.1991), rev'd on other grounds, 630 So.2d 107 (Ala.1992), this Court held:
"`Joinder of offenses is permitted if the offenses 1) share the same or similar characteristics, or 2) involve the same conduct or connection in their commission, or 3) are part of a common scheme. See Rule 15.3(a), A.R.Crim.P.Temp. (now Rule 13.3(a), A.R.Crim.P.). See also Butler v. State, 439 So.2d 210 (Ala. Cr.App.1983). "Joinder, and thus consolidation, is appropriate where the crimes are of similar character, meaning nearly corresponding, resembling in many respects, or having a general likeness. United States v. Werner, 620 F.2d 922, 926 (2d Cir.1980)." Ex parte Hinton, 548 So.2d 562, 566 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The question is whether the offenses are of a same or similar character so that a person evaluating the crimes would believe that the offenses were committed by the same person. See King v. State, 518 So.2d 880 (Ala.Cr.App.1987).'
"630 So.2d at 95-96."
Gagliardi v. State, 695 So.2d 206, 207 (Ala. Cr.App.1996). Furthermore,
"[t]he trial court may order separate trials for the offenses if it appears the defendant will be prejudiced by the joinder of the offenses. Ala.R.Crim.P. 13.4. `The burden of proof is on the defendant to demonstrate specific and compelling prejudice which the trial court cannot protect against and which causes him to receive an unfair trial.' Summerlin v. State, 594 So.2d 235, 236 (Ala.Crim.App.1991). See also Hinton v. State, 548 So.2d 547 (Ala.Crim.App. 1988), aff'd, 548 So.2d 562 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). `The granting of a severance rests within the discretion of the trial court and its refusal to sever counts or defendants that are properly joined will only be reversed for a clear abuse of discretion.' Summerlin v. State, 594 So.2d at 236. See also King v. State, 518 So.2d 880 (Ala.Crim.App.1987).
". . . .
"Additionally, `[n]o prejudice results where the jury could easily separate the evidence of the separate crimes.' Summerlin v. State, 594 So.2d at 236.'"
Snell v. State, 677 So.2d 786, 789 (Ala.Cr. App.1995). In this case, Rita Boyette's car was stolen immediately after the murder and was used by the defendant to transport himself away from the vicinity of the crime to Florida. According to the evidence, the car was apparently stolen after Linder, who was supposed to park his truck and wait for Scott to return after the killing, was questioned by the police and was told to move along. Clearly, the two crimes were "[connected] in their commission" and were "part of a common scheme or plan." Gagliardi v. State, 695 So.2d 206, 207 (Ala.Cr.App.1996), quoting Yelder v. State, 630 So.2d 92 (Ala.Cr.App. 1991), rev'd on other grounds, 630 So.2d 107 (Ala.1992). Thus, no error occurred in regard to the joinder of the murder charges and the theft charge.

V.
Scott contends that the fingerprints lifted from the stolen vehicle and offered into evidence were improperly admitted because, *182 he argues, the State failed to establish a proper chain of custody for those fingerprints. In support of this claim, he cites Knight v. State, 659 So.2d 931 (Ala.Cr.App. 1993), which reversed a criminal conviction because the State had not established a proper chain of custody for pieces of glass from which the defendant's fingerprints were lifted. In that case, the Court of Criminal Appeals reversed a conviction for receiving stolen property in the first degree, stating:
"In Ex parte Holton, 590 So.2d 918, 920 (Ala.1991), the Alabama Supreme Court stated:
"`The chain of custody is composed of "links." A "link" is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: "(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition." Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
"`If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a "missing" link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the "link," as to one or more criteria or as to one or more links, the result is a "weak" link. When the link is "weak," a question of credibility and weight is presented, not one of admissibility.'"
Knight v. State, 659 So.2d at 932. Scott did not object at trial as to the chain of custody, and he did not make this claim in the Court of Criminal Appeals; therefore, we will consider his argument under the "plain error" rule. See Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990).
In Magwood v. State, 494 So.2d 124 (Ala. Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986), the Court of Criminal Appeals held that fingerprint evidence was properly admitted where the prints were identified by the persons who took them and those persons testified that the prints were in substantially the same condition when offered at trial as when they were taken from the crime scene:
"It should be noted that the officers who prepared the prints, latent and known, identified them at trial, and testified that they were in substantially the same condition as when they were first taken. The fingerprint expert identified them as the ones she used in her comparisons. Evidence of fingerprints is capable of eyewitness identification, and it is a sufficient foundation for the introduction of such evidence that a witness identifies it and it has relevance to the issues of the case. Under these circumstances it is not necessary to establish a complete chain of custody. [Citations omitted.] Chain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves. [State v. Beck, 167 W.Va. 830, 286 S.E.2d 234 (1981).] The fingerprint and palm print exhibits introduced in evidence in this case squarely fall into the category of evidence unique and independently identifiable."
494 So.2d at 144.
At Scott's trial, the State offered the testimony of James Bryan Gettemy, a senior crime laboratory analyst, who testified as follows:
"A. I received the call July 12th of '93. I actually received it from the Pensacola Regional Crime Lab requesting our assistance because their unit was already out.
"Q. Where was this car at?
"A. It was at the Panama City Beach Police Department and I made arrangements with them to go the following day on the 13th to process the automobile.
". . . .

*183 "Q. To make sure we're talking about the same car, we have a photograph here of Mrs. Boyette's car, is
"A. Yes, that's the one.
". . . .
"Q. Let me show you State's Exhibit 52. Can you identify what that is?
"A. Yes, these are two lifts that I made off the gearshift of the automobile. On the back of the lifts they've got my case number and the date and the initials that I made them. Also, on the front you can see my number and initials.
". . . .
"Q. And you say you can identify these with certainty because you initialed them and gave them a case number?
"A. Yes."
R.T. at 592-95. Robert Vanhorn, an employee at the Geneva County jail, testified:
"Q. Did you fingerprint the defendant over here, Mr. Scott?
"A. Yes, sir.
"Q. Let me show you State's Exhibit 53. Can you identify that?
"A. It's the fingerprints I took of David Scott.
". . . .
"Q. And when you took the defendant's fingerprints on these cards, did you have him sign it?
"A. Yes, sir.
"Q. And is that his signature on these three cards?
"A. Yes, sir."
R.T. at 598-99. Following Vanhorn's testimony, Gloria Waters, a certified latent print examiner for the Alabama Department of Public Safety, testified, in part:
"Q. Were you asked to make some comparisons in the case that we're here on today?
"A. Yes, I was.
"Q. Before we ask you about your comparisons, could you look at State's Exhibit 54. Could you tell us what that is?
"A. This is a set of inked palm prints.
"Q. Of whom?
"A. They bear the name of William David Scott.
"Q. And who furnished you these?
"A. They were sent to me by Investigator Merritt, Agent Merritt.
"Q. This is an original?
"A. Yes, it is.
"Q. And let me show you a set of fingerprints named State's Exhibit 53.
"A. Yes.
"Q. And you have seen these before today?
"A. Yes, I have.
"Q. And have you used these to make some of your comparisons that we're going to talk about?
"A. Yes, I have.
"Q. And these have been identified to us [as] the fingerprints of David ScottDave Scott?
"A. That is the name on the card, yes.
"Q. Of course, you don't know Mr. Scott?
"A. No, I do not.
"Q. You've never seen him before?
"A. No.
". . . .
"Q. Have you compared this palm print and fingerprints on this card to these three cards?
"A. Yes, I have.
"Q. And what can you tell us?
"A. The fingerprints on the fingerprint card and the fingerprints on theattached to the palm prints on that card belong to the same individual.
"Q. So, this is right- and left-hand palm-and fingerprints?
"A. That's correct.
"Q. And they match this set of prints?
"A. That's correct.
"Q. Have you seen State's Exhibit 52 before today?
"A. Yes, I have.
"Q. And where have you seen them before?
"A. At my office in Montgomery.
"Q. And have you examined those prints?
"A. Yes, I have.

*184 "Q. Have you compared them to these other sets of fingerprints that we've talked about?
"A. Yes, I have.
". . . .
"Q. Did you have any difficulty in determining that these prints were all the same?
"A. No."
R.T. 603-08. We conclude that the court did not err in admitting the fingerprints.

VI.
The State attempted to show that Scott committed the killing for pecuniary gain, but in showing that it did not call Jesse Richburg to testify. Instead, according to Scott, the State relied on statements made by him to his accomplices, James Linder and James Fletcher, regarding "future jobs" that might be offered him after the murder of J.W. Griffin. The State argues that the testimony regarding "future jobs" was admissible in order to show the defendant's motive for killing Griffin. We agree. In Jordan v. State, 629 So.2d 738 (Ala.Crim.App.1993), cert. denied, 511 U.S. 1112, 114 S.Ct. 2112, 128 L.Ed.2d 671 (1994), the Court of Criminal Appeals held that evidence that "the appellant stated that he wanted to move up in rank with his gang and that he knew that committing crimes could earn him a higher rank" was admissible to establish motive. 629 So.2d at 741. The testimony at Scott's trial was properly admitted to show that one of his motives for committing the crime was the promise of "future jobs."

VII.
During their deliberations, the jurors requested clarification on the evidence:
"THE COURT: Ladies and gentlemen of the jury, the bailiff just presented me with the following question[s]: (1) `May we know the exact location of the fence where bushes were pushed down on Exhibit 5 and Exhibit 1?' (2) `We would like to see the court record of the testimony given by Linder and Fletcher and all of the testimony given by the witnesses in the court.'" R.T. at 915-16. Although he did not object at trial, Scott now contends that the trial court erred in denying both requests from the jury. We review these alleged errors for "plain error." See Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990).
"The rule governing additional instructions to a jury is Rule 22.2, Ala.R.Crim.P., which provides:
"`After the jurors have retired to consider their verdict, if they request to have any testimony repeated, or if they or any party requests additional instructions, the court may recall the jurors to the courtroom and order the testimony read or give appropriate additional instructions. The court may also order other testimony read or give other instructions, so as not to give undue prominence to the particular testimony or instructions requested. Such testimony may be read or such instructions given only after notice to the parties.'
`This rule is permissive, rather than mandatory[,] as evidenced by the use of the word "may."' Jackson v. State, 581 So.2d 553, 559 (Ala.Crim.App.1991)."
Grayson v. State, 675 So.2d 516, 523 (Ala.Cr. App.1995) (emphasis added). Furthermore, "[t]he decision to allow the jury to rehear testimony rests with the trial judge." Collins v. State, 611 So.2d 498, 502 (Ala.Cr.App. 1992) (citing Fitchard v. State, 424 So.2d 674 (Ala.Cr.App.1982); Hammes v. State, 417 So.2d 594 (Ala.Cr.App.1982); Martin v. State, 504 So.2d 335 (Ala.Cr.App.1986), and United States v. Sims, 719 F.2d 375 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984)). The two requests made by the jurors did not indicate confusion as to a legal issue. See Deutcsh v. State, 610 So.2d 1212, 1218 (Ala.Cr.App. 1992). Rather, the requests seemed to be, as the State argues, requests to rehear a substantial portion of the case. The trial judge did not abuse his discretion in refusing the jurors' requests.

VIII.
The defendant contends that the State "use[d] refreshing recollection as a guise for introducing the contents of an otherwise *185 inadmissible writing." According to the defense, the State questioned James Linder and "apparently hoped he would tell the jury that Mr. Scott admitted the killing." The defense says that when Linder did not so testify, the State had Linder basically read excerpts from an earlier interview, without testifying to a revival of his independent recollection thereof. Linder testified as follows:
"[A.] ... Mainly, we [Scott and Linder] were just talking about getting the truck home. He did say something about it.
"[Q.] Well, let me show you a transcript of that conversation and maybe it will help you refresh your memory as to what you said then and what happened.
"[A.] (Pause)
"[Q.] You are nodding your head?
"[A.] Yeah, I'm remembering now.
"[Q.] Does this help you remember what the defendant told you had happened the night before?
"[A.] Right.
"[Q.] Now can you tell us what the defendant had told you happened the night before while you were up there at the bus station?
"[A.] He said that he went in the house and that the guy had been sleeping and that he couldn't make heads or tails of where his head or his feet was and when he got up either to go in the kitchen to get a drink or something that
"[Q.] Didn't you say he told you that
"[Defense attorney]: Objection to leading.
"The Court: Try not to lead, just let him testify.
"[A.] Anyway, he said when the guy got up that he shot him twice and there was two bullets gone in the gun.
"[Q.] Did he tell you where he shot the man?
"[A.] He shot him once in the head and once when he was going down.
"[Q.] Did he tell you how he got in the man's home?
"[A.] He crawled through a window.
"[Q.] Did he tell you what he did when he got inside?
"[A.] I can't remember.
"[Q.] Let me show you the next page of what you were reading there.
"[A.] Okay.
"[Q.] Do you remember something else the defendant told you?
"[A.] He was talking about when somebody dies that it's not like on TV where they go flip-flopping around and jump up and down...."
R.T. at 533-36. The trial court did not err in allowing Linder to look at his earlier statement.
"`A witness may refer to a writing for the purpose of refreshing his recollection without first, as a condition precedent, having shown that it is necessary for his recollection to be refreshed.'"
Hagood v. State, 588 So.2d 526, 535 (Ala.Cr. App.1991), quoting C. Gamble, McElroy's Alabama Evidence, § 116.02(6) (3d ed.1977). As to the defendant's claim that Linder did not testify that his memory had been revived after he had looked at the earlier statement, we conclude that his statement, "Yeah, I'm remembering now" sufficiently indicates that the statement had refreshed his memory.

IX.
The defendant next contends that the transcript in this case is flawed because during voir dire examination of the prospective jurors the names of some venire-members answering questions were omitted and that this flaw requires a reversal of his capital conviction. He argues that these omissions make it impossible for a reviewing court to determine whether certain veniremembers should or should not have been struck for cause. Although the defendant did seek to supplement the record with the missing names, the court reporter's "response to motion to supplement the record" states that "the [prospective juror's] name is not included if the juror failed to announce it before answering a question."[3]
*186 In Hammond v. State, 665 So.2d 970 (Ala. Cr.App.1995), the Court of Criminal Appeals reversed a conviction because portions of the examination of veniremembers had been omitted from the record:
"After a careful review of the record before us, we conclude that the missing portion of the voir dire examination and the proceeding relating to challenges for cause constitutes a substantial and significant portion of the record, and that the missing portions of the record adversely affect a substantial right of the appellant. The state's failure to afford the appellant a record sufficiently complete to permit review of the issue of the exclusion of the venirepersons for cause constitutes reversible error."
665 So.2d at 973. This case is not like Hammond. In this case, there are no missing portions of the record; the names of some of the veniremembers simply were not stated for the record during the voir dire examination. We have reviewed the record of the voir dire examination, and we conclude that the fact that some names are missing has not adversely affected the defendant's right to a complete record for the purposes of appellate review.

X.
Scott argues that the trial court erroneously refused to strike for cause two veniremembers who indicated that they believed an innocent defendant would testify in his own behalf. Scott did not object at trial; therefore, we consider this argument under the plain error rule. The defendant's questions to the venire were as follows:
"[Q.] But, would you think that an innocent person would get up there and take that stand and say, `I didn't do it?'
"Juror: I would.
"[Q.] You would?
"Juror: I would.
"[Q.] All right. Does anyone else feel that way?
"Juror: If you didn't do it, you would take the stand and say, `I didn't do it.' I would.
"[Defense]: All right, Mr. Emery over [there] is the State prosecutor and he is skilled, from what I understand, in cross-examining witnesses. He's got a lot of information about this case, a lot of little questions, and he could ask you a lot of questions that might make you look bad and make you look like you weren't telling the truth, even though you are. Would you consider that?
"Juror: I would still take the stand.
"[Defense]: So, if at the close of this case we decide, Mr. Knowles [another defense attorney] and I and the defendant and all of us on this side of this thing, decide for him not to take the stand and just let everybody gamble on whether he's telling the truth or not, rather than base your case on all the other evidence or lack of evidence that they presented, how many of you will let that fact in itself mean to you that he must have done it or he would have gotten up there and said something? Mr. C., I think you kind of feel that way, don't you?
"Mr. C.: You asked me what I would do.
"[Defense]: That's what I'm doing.
"Mr. C.: That's got nothing to do with that, but you asked me what I would do.
"[Defense]: I know, but if you had to be one of these twelveokay, I've got you. But if that's what you would do and that's what this lady here indicated she would do, does
"Juror: I haven't heard this case yet, I'm just telling you what I would do.
"[Defense]: Okay. But, if the Judge give you an instruction and says you're not to give that any weight at all if he elects not to take the stand, are you going to be able to just cleanly separate that from what you would do?
"Mr. C.: After I hear the evidence, I will."
R.T. at 67-69. The questions by the defense and the responses from the two veniremembers, as indicated by the responses of Mr. C., indicated what the veniremembers themselves would do under the circumstances described by the defense. Mr. C., in particular, differentiated between what he would do and his ability to apply the law in this case. The answers to the questions asked of both jurors did not "[import] absolute *187 bias or favor, [leaving] nothing to the discretion of the trial court," Nettles v. State, 435 So.2d 146, 149 (Ala.Crim.App.), aff'd, 435 So.2d 151 (Ala.1983). Thus, the trial judge's failure to sua sponte strike them for cause was not error.

XI.
Next, Scott argues that the prosecutor improperly commented on his failure to testify. The prosecutor commented during closing argument: "There's been no testimony why he was up here except from James Linder and that was to do murder." R.T. at 873. Scott contends that the only other person who could possibly have offered testimony as to "why he was up here" was the defendant Scott himself. Citing Windsor v. State, 593 So.2d 87 (Ala.Cr.App.1991), and Ex parte Purser, 607 So.2d 301 (Ala.1992), Scott claims that this statement by the prosecutor was a reference to Scott's failure to testify.
The context in which this comment was made was as follows (quoting here the prosecutor's closing argument):
"Now, somehow or another, [the defense's] own witness Naomi Stevens is important to their defense. Naomi Stevens came out here and said that she had seen this man in Geneva, Alabama, at the produce store, something that [the defense] says is a given. And for that, not only she but the district attorney and the police officers are accused of manipulating her to testify to something.
"Of course, she was right when she said that's the man she saw because he was in Geneva, Alabama. That's not significant. His own lawyer told you that he was here. So, common senseI mean is that really significant whether she's wrong about the date, or, that when she picked somebody out of the photographs she picked the other person? Maybe she saw both of them. She wasn't shown at that time a picture of the defendant because he wasn't a suspect.
"So, what's the significance of the fact that she says she saw James Linder? What's the significance of the fact that she saw the defendant? His lawyer admits he was here at the time of the murder. Now, what is sad about this admission and this testimony from [the defense attorney] as to why he was herewell, the Judge will instruct you, and you know it is just a matter of common sense, that what lawyers say or district attorneys say or what [the defense attorney] says and Mr. Knowles's opinion, has no value in this case whatsoever. The evidence is what you're here to evaluate, not what [the defense attorney] told you happened, not why [the defense attorney] told you his client was up here.
"There's been no testimony why he was up here except from James Linder and that was to do murder. This business about settling a drug debt with Mr. Griffin is blasphemy. No one ever said that except [the defense attorney]. He came into this courtroom and accused Mr. Griffin of being a drug dealer and owing his client drug money."
R.T. a t 872-74. It is clear to this Court that the context in which the prosecutor's comment was made reflected not a comment on the defendant's failure to testify, but, rather, a reminder that the defense attorney's closing argument was not testimony or evidence and should not be considered as such by the jury.

XII.
The defendant next argues that the trial court erred in conducting voir dire examination of jurors in open court without privately asking questions of jurors who indicated they had certain beliefs or personal views on any of the issues in the case. The defendant never requested individual voir dire, and any alleged error with regard to this issue must be considered pursuant to the plain error rule.
"Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, and it is within the trial court's discretion whether to allow such a request. Bell v. State, 475 *188 So.2d 601 (Ala.Cr.App.1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Raines v. State, 429 So.2d 1104 (Ala.Cr. App.), aff'd, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). The decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion."
Hallford v. State, 548 So.2d 526, 538-39 (Ala. Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). The veniremembers in this case were questioned in three panels. Our review of the record indicates no abuse of discretion in the trial judge's failure to order individual voir dire of prospective jurors.

XIII.
Although at trial the defendant made no objection in this regard, he now contends that it was improper for the trial judge to admit into evidence the voice identification of Scott made by Ronnie Thomas. Thomas testified at trial that he recognized Scott's voice during a telephone conversation wherein he was instructed to pick up a burned truck and tow it to his garage. Scott claims that this voice identification was not properly authenticated. In particular, he claims that no basis for comparison was offered. We disagree. Thomas testified that he had known Scott for two to three years before he received the telephone call; thus, the requirement of a basis for comparison was satisfied. See Odom v. State, 356 So.2d 242, 245 (Ala.Cr.App.1978):
"Generally, testimony by a witness that he recognized the accused by his voice is admissible in evidence, provided only that the witness has some basis for comparison of the accused's voice with the voice which he identifies as that of the accused."
(Emphasis added.) See also Favors v. State, 437 So.2d 1358 (Ala.Cr.App.), aff'd, 437 So.2d 1370 (Ala.1983). The admission of Thomas's testimony was not plain error.

XIV.
Scott contends that the trial court erred in admitting photographs of the victim's body, as well as an ax and a gun found at the crime scene. Those photographs and the ax and the gun, he argues, were inflammatory, and he says the only purpose for introducing them was to prejudice the jury against him.
"Under the liberal test of admissibility in Alabama, `a fact is admissible if it has any probative value, however slight, upon a matter in the case.' [C. Gamble, McElroy's Alabama Evidence, § 21.01 at 34 (4th ed.1991).] `Evidence as to the scene of a crime, as to objects found thereat, and as to the condition of the body, is admissible and relevant evidence, when reasonably proximate to the scene in time and location.' Petty v. State, 40 Ala.App. 151, 154, 110 So.2d 319, 322 (1958), cert. denied, 269 Ala. 48, 110 So.2d 325 (1959). Evidence as to objects found at or near the scene of the crime charged within a reasonable time and proximity after the commission of the crime is `always admissible.' Busbee v. State, 36 Ala.App. 701, 703, 63 So.2d 290, 292 (1953)."
Parker v. State, 587 So.2d 1072, 1090 (Ala. Crim.App.1991). The trial judge did not abuse his discretion in allowing the photographs, because they were used to corroborate the testimony of an investigator from the Alabama Bureau of Investigation concerning the location of the victim's wounds. As to the ax and the gun, the investigator testified that neither the ax nor the gun had anything to do with the crime. Thus, any error concerning them was harmless error. See Freeman v. State, 681 So.2d 245, 246 (Ala.1995), wherein this Court stated:
"The evidence regarding the two guns and the beeper seized from the [automobile] did not add anything to the State's case, nor did it shed any light on any disputed issue. Its introduction, therefore, was harmless error. Dalton v. State, 488 So.2d 13, 14 (Ala.Crim.App.1986)."

XV.
Scott next contends that at trial the State ignored the fact that the trial court had *189 granted a defense motion to prohibit any mention of illegal drugs found in his possession when he was arrested. According to Scott, the State ignored the trial court's directive and elicited testimony from James Linder that he and Scott had been snorting cocaine on the night of the murder. Scott argues that this evidence was used solely to prove that he was of a bad character. See Tabb v. State, 553 So.2d 628 (Ala.Crim.App. 1988). In Tabb, the defendant's capital murder conviction was reversed because at trial the State offered evidence that the defendant took drugs; the Court of Criminal Appeals held:
"There was no other evidence at trial that the appellant took drugs, nor were drugs involved in any way in the offense.... We can find no purpose in the elicitation of this testimony, other than to show the bad character of the appellant."
553 So.2d at 630. (Footnote omitted.)
The State, on the other hand, argues that it did not violate the judge's order because, it says, the motion had been granted only as to cocaine found in a bag Scott had with him when he was arrested. Furthermore, the State argues, James Linder testified that he and Scott had taken drugs on the night of the crime. This evidence was relevant to show Scott's mental state at the time of the crime. We agree. See Hunt v. State, 659 So.2d 933, 940 (Ala.Crim.App.1994), aff'd, 659 So.2d 960 (Ala.1995); Brown v. State, 492 So.2d 661, 663-64 (Ala.Crim.App.1986).

XVI.
We have reviewed the remaining issues raised by Scott regarding his conviction for capital murder, and we have found no error. In addition, we have searched the record for plain error as to his conviction and have found none.

XVII.
We now must consider whether Scott's sentence of death by electrocution is appropriate. § 13A-5-53(a), Ala.Code 1975. At the sentencing hearing, the State attempted to prove three aggravating circumstances: (1) that the murder was committed during a burglary; (2) that it was committed for pecuniary gain; and (3) that it was committed to hinder law enforcement. See Ala.Code 1975, § 13A-5-49. At oral argument before this Court, Scott's main contention regarding the sentencing hearing concerned the testimony of Jimmy Hand, who, Scott argues, gave "hearsay upon hearsay" testimony regarding the relationship between Jesse Richburg, Rhonda Bohannan, and Griffin. Scott argues that Hand's hearsay testimony was not rebuttable because, he says, Richburg and Bohannan were fugitives from justice and Griffin was dead.
After reviewing the transcript of the sentencing hearing, we conclude that if any error occurred it was harmless, for the following reasons: First, the jury voted 12 to 0 to recommend that Scott be sentenced to life imprisonment without the possibility of parole. Thus, obviously, Hand's testimony did not adversely affect the recommendation of the jury. See Giles v. State, 632 So.2d 568, 574 (Ala.Cr.App.1992), aff'd, 632 So.2d 577 (Ala.1993), citing Rule 45, Ala.R.App.P. Second, our review of Hand's testimony indicates that its only value was to attempt to prove the third aggravating circumstance the State was arguing, i.e., that the murder was committed to hinder law enforcement. The trial court, in its extensive order, did not find this to be an aggravating circumstance:
"The Court finds from the evidence that the defendant, William David Scott, did intentionally cause the death of J.W. Griffin by shooting him two times with a pistol, once above the right eye and once in the center of his back, and that at the time that he caused Mr. Griffin's death he knowingly and unlawfully entered and remained in Mr. Griffin's home with the purpose and the intent to murder Mr. Griffin; and while entering or while in the home, he did kill Mr. Griffin by shooting Mr. Griffin with a deadly weapon, a firearm.
"The Court further finds that the defendant intentionally caused the death of Mr. Griffin by shooting him with a pistol for a pecuniary or other valuable consideration and that he was hired to kill Mr. Griffin for the sum of $5,000.00.
"The Court finds that this was a premeditated, planned, deliberate and coldblooded *190 killing by one human being of another human being. The defendant did not know the deceased. He was hired to kill the deceased for money and he did. He came from central Florida to Geneva County and for the agreed-upon sum of $5,000.00, he executed Mr. Griffin without any warning while the deceased was sitting in the comfort of his own home. The Court can think of no more calculated killing than a murder for hire. The defendant showed no mercy. The conduct of the defendant throughout this episode demonstrates conduct that is totally and senselessly bereft and devoid of any regard for human life.
"The Court finds the evidence and circumstances as proved, produce a moral conviction to the exclusion of all reasonable doubt, the guilt of the defendant, and further, the circumstances as proved are incapable of explanation upon any reasonable hypothesis consistent with his innocence [sic]. The Court finds that the State has proven the defendant's guilt as charged in the Indictment beyond a reasonable doubt.
"The Court has considered each of the aggravating circumstances enumerated in Section 13A-5-49, Code of Alabama (1975), and the Court finds that the capital offense was committed while the defendant was engaged in the commission of burglary.
"The Court further finds the capital offense was committed for pecuniary gain.
"The Court finds that no other aggravating circumstances are applicable to this case.
"The Court has considered each of the mitigating circumstances enumerated in Section 13A-5-51, Code of Alabama (1975), and any additional mitigating circumstances offered by the defendant or evident from the evidence in the case or any evidence touching on mitigating circumstances.
"In so considering the enumerated mitigating circumstances, the Court finds that even though the defendant has an extensive arrest record, he has no significant history of prior criminal activity.
"The Court further finds that the capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance; the victim was not a participant in the defendant's conduct or consented to it; the defendant was not an accomplice, but was the actual killer; the defendant was not acting under extreme duress or under substantial domination of another person; and that the defendant did appreciate the criminality of his conduct and was fully aware of what he was doing and that his capacity to conform his conduct to the requirement of law was not substantially impaired and that the defendant was 35 years old on July 10, 1993.
"The Court further has considered the verdict of the jury and its recommendation of life without parole and as a further mitigating factor, the court considered the disposition of the charges or possible charges against the others who were involved in the murder of Mr. Griffin. The Court has further considered the other circumstances offered by the defendant as mitigating circumstances at the Court's sentencing hearing.
"The Court has considered all of the evidence presented in the case and the Court has weighed the aggravating and mitigating circumstances against each other. The Court finds that the aggravating circumstances which exist outweigh the mitigating circumstances which exist. The Court has considered the recommendation of the jury of life without parole.
"And the Court having considered all of the above, the Court finds that the advisory verdict of the jury of life without parole should be overridden. The Court has given great weight to the advisory verdict of the jury and considered the jury's verdict an important factor in determining the appropriate sentence. However, the Court rejects the recommendation of the jury in its advisory verdict based on the findings and conclusions as set out in this sentencing order.
"And the Court, having considered all of the above, finds that the defendant, William *191 David Scott, should be sentenced to death and is hereby sentenced to death."
C.R. at 184-87.
In rejecting the jury's unanimous recommendation that Scott be sentenced to life imprisonment without parole, the trial court found only two aggravating circumstances. The trial court did not find the third aggravating circumstance the State had sought to provethat the murder was committed to hinder law enforcement; thus, any error in admitting Hand's testimony was harmless.
This Court must make an independent weighing of the aggravating circumstances and the mitigating circumstances to determine if death is the appropriate sentence in this case. § 13A-5-53(b), Ala.Code 1975. We have considered the facts as shown by the evidence in this case; the advisory verdict of the jury recommending that Scott be sentenced to life imprisonment without parole; and the extensive order of the trial judge. We note that this is not the first time a trial court has overridden a unanimous jury's recommendation that the defendant be sentenced to life imprisonment without parole. See Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, Ex parte Bush, 695 So.2d 138 (Ala.1997); Carr v. State, 640 So.2d 1064 (Ala.Cr.App.1994.)[4] Nor is this the first case wherein a defendant has been sentenced to death for the capital crime of murder committed for pecuniary gain or for hire or murder committed during a burglary. See, e.g., Sockwell v. State, 675 So.2d 4, 12 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala. 1995) (defendant convicted of "murder ... for pecuniary gain or for valuable consideration or pursuant to a contract or for hire"); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (defendant convicted of murder committed for pecuniary gain and committed against an on-duty deputy sheriff); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993) (defendant convicted of murder committed for hire and during a robbery); Land v. State, 678 So.2d 201 (Ala.Crim.App.1995), aff'd, 678 So.2d 224 (Ala.1996) (defendant convicted of murder during a burglary in the first degree and during a kidnapping in the first degree). Based on the foregoing and on our independent weighing of the aggravating circumstances and the mitigating circumstances, we find no error in the trial court's sentencing of William David Scott to death.
Therefore, we affirm the judgment of the Court of Criminal Appeals affirming Scott's conviction and sentence of death by electrocution.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, BUTTS, and SEE, JJ., concur.
HOUSTON, J., concurs specially.
HOUSTON, Justice (concurring specially).
I write specially only to address the following argument of the defendant:
IV. "[T]hat the trial court's decision to override the jury's recommendation of life imprisonment without parole and to sentence him to death was not supported by either the evidence or the law."
The jury unanimously recommended life imprisonment without parole.
The Constitution of Alabama of 1901, upon its ratification, expressly conferred upon juries the power to impose either the sentence of death or the sentence of life imprisonment for defendants found guilty of murder in the first degree (Ala.Code 1897, § 4858). In my dissent in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), I expressed my concern that the majority's interpretation of § 11 of the Constitution ("[t]hat the right to trial by jury shall remain inviolate") would make what is now Ala.Code 1995, §§ 13A-5-1 through -59, "Punishments and Sentences," unconstitutional. In Ex parte Giles, 632 So.2d 577, 583 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994), the majority of this Court, by legal reasoning I could not follow, held:
"[Section] 11 does not preclude the judge's override of the jury's recommendation of life imprisonment in a capital case, and *192 reaffirm the principle that, in Alabama, the `judge, and not the jury, is the final sentencing authority in criminal proceedings.'"
This is correct only if the jury's right to sentence a defendant to death or to life imprisonment for murder in the first degree or to a term of imprisonment for defendants found guilty of murder in the second degree (Ala.Code 1897, § 4858), manslaughter (§ 4862), rape (§ 5444), robbery (§ 5479), and other offenses (§§ 5050, 4420, 4758) did not become inviolate upon the ratification of the Constitution of 1901.
Section 11 applies to both civil cases and criminal cases. How the majority of this Court interpreted § 11 the way it did in criminal cases, in which punishment and deterrence are involved and in which one party's life, liberty, or property is at stake; and another way in civil cases involving punitive damages, in which punishment and deterrence are involved and in which no party's life or liberty, but only the defendant's property interest, is at stake, causes me grave concern. Henderson v. Alabama Power Co., 627 So.2d at 904-07 (Houston, J., dissenting); Ex parte Giles, 632 So.2d at 587-89 (Houston, J., concurring in the result); Smith v. Schulte, 671 So.2d 1334, 1366-68 (Ala.1995) (Houston, J., dissenting), cert. denied, 517 U.S. 1220, 116 S.Ct. 1849, 134 L.Ed.2d 950 (1996); Ex parte Jackson, 672 So.2d 810, 811-13 (Ala.1995) (Houston, J., concurring in the result), cert. denied, 517 U.S. 1247, 116 S.Ct. 2505, 135 L.Ed.2d 195 (1996).
NOTES
[*] Although Justice Cook was not present at oral argument, he has listened to the tape of the oral argument.
[**] Note from the reporter of decisions: The opinion of the Court of Criminal Appeals spells this person's name "Jessie Richburg."
[1] The Court of Criminal Appeals has stated:

"The purpose of § 12-21-222 was to ensure that the testimony of a guilty party testifying in return for leniency from the state would not alone be sufficient to convict another."
Hergott v. State, 639 So.2d 571, 573 (Ala.Cr.App. 1993).
[2] Stevens had previously identified Linder as the person who inquired about Griffin's whereabouts; however, at trial, she said that Scott was the man who came to the produce stand and asked where Griffin was.
[3] Most of the times when a veniremember's name was omitted, the defense was questioning the venire.
[4] Because of the defendant Carr's death, this Court did not review his case.