[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 564 
This is a capital case. The following issues are presented:
I. Whether the accused was deprived of a fair trial when two capital cases against him were consolidated for trial.
II. Whether it was error to allow evidence of ballistics tests when the bullets from the victims were introduced into evidence but the test bullets were not.
III. Whether it was error to allow a ballistics expert to testify about the test bullets when they had not been admitted into evidence.
IV. Whether the evidence was sufficient to sustain the convictions.
V. Whether the accused should have been allowed to introduce polygraph results at the guilt and sentencing phases of the trial.
 FACTS
Anthony Ray Hinton was indicted for the robbery-murder of John Davidson and the robbery-murder of Thomas Wayne Vason. These two cases arose out of separate incidents but were consolidated for trial due to the similarity of the two murders.
The evidence showed that Davidson was the night manager at Mrs. Winner's restaurant on Clairmont Avenue in Birmingham. After midnight on the morning of February 24, 1985, an insect exterminator found Davidson lying in a pool of blood in the restaurant; Davidson was able to get up and move around but never said anything. The trail of blood indicated that Davidson had been shot inside the cooler. Davidson had been shot in the head twice and soon died thereafter at the hospital. The restaurant had been robbed of $2,100.00. No witnesses saw the robbery-murder, and no fingerprints that matched the defendant's or anyone else's were ever found.
Vason was the night manager at a Captain D's restaurant in Birmingham. On the morning of July 2, 1985, the manager of the restaurant found Vason's body in the cooler. Vason had been shot in the head twice. Vason had called the regional office with the sales total at approximately 12:45 a.m. on July 2; $650.00 dollars was missing from the safe.
On July 25, 1985, Sidney Smotherman worked as the night manager at a Quincy's restaurant in Bessemer. He left the restaurant after closing at about 12:26 a.m., on the morning of July 26, 1985, and went to a nearby Food World store to get some beer. Another employee of Quincy's was in the Food World store at the time and spotted a black man acting strangely; that black man followed Smotherman out of the store. That witness later identified Hinton as that man. Smotherman began to drive home, but another car bumped into the back of his. When Smotherman investigated the accident, the driver of the other car abducted Smotherman at gunpoint. Smotherman stated that the other car was a large, dark-colored, mid-1970's model, perhaps a Buick or Chevrolet. The gunman *Page 565 
forced Smotherman to get into the gunman's car, drove Smotherman's car off the road, and then got back into his car and drove Smotherman back to the Quincy's restaurant, and, while in the car, the gunman told Smotherman that he had been waiting for Smotherman and that he had to be in Atlanta in three hours. He ordered Smotherman to give him the money in the safe. After he had the money, the gunman told Smotherman to get into the cooler. Having heard about the other robbery-murders, Smotherman asked to be put in the storeroom. The gunman agreed, and as Smotherman entered the storeroom, he turned to kick the door shut (it had an automatic lock), and as Smotherman did so, the gunman shot twice, hitting Smotherman in the head and finger. Smotherman survived the attack and later identified Hinton as the man that had abducted and attacked him. No fingerprints were found in Smotherman's car or in the Quincy's restaurant.
Reginald White, a Quincy's employee, had known Hinton for years but had not seen him in the past four years until about two weeks prior to the Quincy's robbery, when Hinton inquired of White whether he still worked at Quincy's and asked White who the manager was, what type of car the manager drove, and what time the restaurant closed.
On July 31, 1985, the police went to Hinton's home and arrested him. They asked his mother whether she had a gun. She said that she did, but she did not find it in the place she usually kept it. Hinton's mother found it in the back bedroom and gave it, and two bullets, to the police. Two state ballistics experts came to the conclusion that the .38 caliber gun given to the police was the same gun that had fired the bullets that had killed Davidson and Vason and that had injured Smotherman.
Hinton produced alibi evidence concerning the Quincy's robbery. Witnesses testified that Hinton had been working at a Bruno's warehouse that morning from midnight until 6:00 and that security was tightly controlled and that no one saw him leave. He also produced evidence that he had been driving a small red Nissan automobile on the night of the Quincy's robbery and that he also owned a small yellow Volkswagen. Hinton's ballistics expert concluded that it was not possible to tell whether all the bullets in question had been fired by the same gun.
The State presented evidence that Hinton also owned a 1974 or 1975 Chevrolet Caprice (which Hinton claimed had been repossessed at the time of the Quincy's robbery), that Hinton had told his boss that he was going to be on his honeymoon in Atlanta from late June until July 4, 1985 (Hinton has never been married), that Hinton claimed to have eaten at the Mrs. Winner's in question, and that Hinton claimed to have known Davidson.
The jury found Hinton guilty in both cases, and the jury recommended a sentence of death. Hinton tried to present to the trial judge evidence that he had passed a polygraph test. Two bailiffs testified that they had heard the defendant say that he knew how to fool a polygraph. The trial judge refused to allow the polygraph results and then sentenced Hinton to death in both cases. The Court of Criminal Appeals affirmed Hinton's convictions and sentences. For a more detailed statement of the facts in this case, see the opinion below. Hinton v. State,548 So.2d 547 (Ala.Crim.App. 1988).
 I
No capital cases have ever before been consolidated for trial in Alabama, and while Rule 15.3, A.R.Crim.P., provides for consolidation of similar offenses, Hinton argues that the consolidation of these two capital cases created such prejudice as to deny him a fair trial. Although different procedures apply in capital cases, we are not convinced that the defendant has shown prejudicial error sufficient to require reversal. Of course, if a defendant can demonstrate actual and compelling prejudice that outweighs the benefits of judicial economy resulting from joinder, the refusal to sever the cases constitutes reversible error. United States v. Payne,750 F.2d 844, 859 (11th Cir. 1985). *Page 566 
The Court of Criminal Appeals noted that Alabama's consolidation rules are very similar to the federal rules concerning joinder, and, therefore, that court reasoned, and correctly, that consideration of federal cases is proper in determining whether this consolidation was proper under Alabama procedural rules. Joinder, and thus consolidation, is appropriate where the crimes are of similar character, meaning nearly corresponding, resembling in many respects, or having a general likeness. United States v. Werner, 620 F.2d 922, 926
(2d Cir. 1980). The Court of Criminal Appeals has recently indicated that the most important consideration in determining whether crimes are similar is whether one offense would have been admissible in the trial of the other. Nickerson v. State,523 So.2d 504, 506-07 (Ala.Crim.App. 1987) (relying on Wright, Federal Practice and Procedure, Criminal 2d, § 143 (1982)). These crimes had many common elements and were almost identical in detail; evidence of each one would have been admissible in the trial of each of the others to establish identity. The identity exception to the general collateral crime exclusionary rule applies where "the circumstances of the charged and noncharged crime exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person." Brewerv. State, 440 So.2d 1155, 1161 (Ala.Crim.App.), cert. denied,440 So.2d 1155 (Ala. 1983). The only real difference between the two charged crimes and the Quincy's robbery was that the victim in the Quincy's case survived.
It is only the most compelling prejudice that will be sufficient to show the court abused it discretion in not granting a severance. United States v. Perez, 489 F.2d 51, 65
(5th Cir. 1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067,41 L.Ed.2d 664 (1974). A mere showing of some prejudice is not enough. United States v. Wilson, 657 F.2d 755, 765 (5th Cir. 1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1456,71 L.Ed.2d 667 (1982); Perez, 489 F.2d at 65. Hinton can show no prejudice here, because the evidence of both crimes could have been presented with or without consolidation. No prejudice results where, as here, the jury could easily have kept separate the evidence of the separate crimes. Crawford v. State,485 So.2d 391, 394-95 (Ala.Crim.App.), cert. denied, 485 So.2d 391
(Ala. 1986).
Although this is the first consolidation of capital cases in Alabama, the consolidation of separate capital murder cases has been allowed in other jurisdictions. People v. Lucky, 45 Cal.3d 259, 753 P.2d 1052, 247 Cal.Rptr. 1 (1988), cert. denied, ___ U.S. ___, 109 S.Ct. 848, 102 L.Ed.2d 980 (1989); State v.Bishop, 753 P.2d 439 (Utah 1988); People v. Gacy, 103 Ill.2d 1, 82 Ill.Dec. 391, 468 N.E.2d 1171 (1984), cert. denied,470 U.S. 1037, 105 S.Ct. 1410, 84 L.Ed.2d 799 (1985). In Lucky, the defendant was convicted of two counts of capital murder, two counts of attempted robbery, and six counts of robbery. There the Supreme Court of California stated:
 "Furthermore, offenses which are committed at different times and places against different victims are nevertheless 'connected together in their commission' when they are, as here, linked by a ' "common element of substantial importance." ' [Citations omitted.]. . . .
 ". . . . Since the statutory requirements for joinder were met in the present case, appellant can establish error only on a clear showing of prejudice. [Citations omitted.]
". . . .
 "The essence of defendant's claim is that prejudice is inevitable whenever a capital case is consolidated with unrelated or independent offenses. Defendant argues that admitting evidence of unrelated charges requires the court to rely on jury instructions to prevent the jury from merely combining the bulk of the evidence and convicting the defendant on the basis of the numerous charged offenses. Therefore, defendant asks us to conclude that such joinders should never be permissible.
 "Courts must always examine consolidation motions for their potentially prejudicial effect, particularly in capital cases. [Citations omitted.] However, there is *Page 567 
no basis for adopting the broad per se rule defendant suggests. [Citations omitted.]
 "Prejudice may arise from consolidation where it allows the jury to hear inflammatory evidence of unrelated offenses which would not have been cross-admissible in separate trials. Even in capital cases, however, consolidation may be upheld on appeal where the evidence on each of the joined charges is so strong that consolidation is unlikely to have affected the verdict. [Citation omitted.]
 "The instant charges might have been cross-admissible in separate trials to show common identity on a modus operandi theory."
45 Cal.3d at 276-78, 753 P.2d at 1062-63,247 Cal.Rptr. at 10-11. Here, as in Lucky, the evidence of the other crimes would have been admissible in separate trials; thus, it was not error to consolidate the two capital cases for trial.
In Bishop, the Utah case, the defendant was convicted of five counts of capital murder, five counts of aggravated kidnapping, and one count of aggravated sexual abuse of a child. In Gacy, the defendant was convicted of 33 counts of murder, including 12 capital counts, and one count of deviate sexual assault and one count of indecent liberties with a child. Although the issue of consolidation did not appear to have been raised in either Bishop or Gacy, neither court saw the consolidation as plain error.
As part of his consolidation argument, Hinton has also argued that it was error to allow evidence of the Quincy's robbery without that crime having been tried first. He contends that because the evidence of the uncharged Quincy's crime did not have to amount to proof beyond a reasonable doubt in order to be admissible, he was denied the opportunity to argue that there was a fatal variance between what the State proved as to the Quincy's robbery and what would have been alleged in an indictment charging that robbery. He argues that a dispute in the evidence over the date of the Quincy's robbery (discussed later in this opinion) and his alibi evidence would have entitled him to an acquittal in a trial on the Quincy's robbery. Thus, claims Hinton, if he had been acquitted in the Quincy's robbery, the evidence of that crime should not have been admitted against him in the capital cases. We cannot agree with Hinton's argument. Although acquittal of an extrinsic offense is admissible to disprove its commission, the acquittal does not bar the admission of evidence of the extrinsic offense in another case. See Ex parte Bayne, 375 So.2d 1239, 1241-42
(Ala. 1979). Also, the United States Supreme Court held inHuddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496,99 L.Ed.2d 771 (1988), that evidence of an extrinsic offense is admissible if it is probative of a material issue other than character and if the evidence is sufficient to allow the jury
to find by a preponderance of the evidence that the act occurred and that the defendant committed the act. The Court expressly declined to require a level of proof of at least a preponderance of the evidence before the trial court could allow evidence of an extrinsic act to go before the jury. Clearly, proof beyond a reasonable doubt is not required before evidence of extrinsic acts may be admitted. We do not think that the admission of the evidence of the Quincy's robbery was error or that the Quincy's robbery had to be tried first in order for evidence of it to be admitted in the trial of these two capital cases.
 II
We now consider Hinton's claims concerning the ballistics testimony. For an expert to give opinion testimony, the opinion must be based upon facts within the knowledge of the expert, or the expert may give an opinion based upon a hypothetical question which itself is based upon facts already in evidence.State Farm Fire Cas. Co. v. Sawyer, 522 So.2d 248, 251 (Ala. 1988); see also C. Gamble, McElroy's Alabama Evidence, § 130.01 (3d ed. 1977). In either event, the facts known to the expert or hypothesized must be facts in evidence. State Farm,522 So.2d at 251; Thompson v. Jarrell, 460 So.2d 148, 150 (Ala. 1984). *Page 568 
The test bullets fired by the State's ballistics expert Higgins were not admitted into evidence; and Hinton argues that the test bullets used for comparison did not qualify as "facts within the knowledge of the expert" because the test bullets were objects and the procedure used to create them took place out of the presence of the defendant and his attorney.
Hinton made no specific objections to the testimony of the State's two ballistics experts in regard to the test bullets; thus, he is claiming that the admission of that testimony was "plain error." This Court has stated that "plain error" arises only "if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367
(1983). Not only was the failure to introduce the test bullets not "plain error," it was not error at all; those bullets were used by the experts only in analyzing the pieces of evidence that they were asked to examine. It was not required that those bullets be introduced into evidence, although they could have been relevant.
Even if the bullets should have been introduced into evidence, however, that would make no difference, because the defendant's own expert used the test bullets and based his opinion testimony upon them. Consequently, because both parties, in the presence of the jury, treated the items as evidence, there can be no error. Jones v. State, 456 So.2d 366,372 (Ala.Crim.App. 1983), aff'd, 456 So.2d 380 (Ala. 1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838
(1988); Golston v. State, 371 So.2d 471 (Ala.Crim.App. 1979). The defense was in no way prejudiced by the failure to introduce the bullets, because the markings the experts relied upon were microscopic and all the jury would have been able to examine would have been a couple of bullets. Thus, the failure to introduce those bullets cannot constitute "plain error," because it was in no way prejudicial to the defendant. Hooks v.State, 534 So.2d 329 (Ala.Crim.App. 1987), aff'd,534 So.2d 371 (Ala. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 883,102 L.Ed.2d 1005 (1989).
 III
Hinton argues that it was error to allow the State's ballistics expert Yates to testify about the bullets because the test bullets had never been admitted into evidence. For the reasons stated above in part II, we hold that it was not error to allow Yates to testify about the bullets.
 IV
The standard for determining the sufficiency of the evidence to sustain a conviction is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt. Eady v. State, 495 So.2d 1161
(Ala.Crim.App. 1986). Hinton argues that the evidence in these cases could not have excluded every reasonable hypothesis but that of guilt, and that no direct evidence of any kind was offered to show that the defendant committed these crimes. He cites the following as evidence of his innocence: there was evidence that similar robberies continued to occur after Hinton was in jail; evidence that Hinton drove a red Nissan on the night of the Quincy's robbery; evidence that Hinton was at work at the time of the Quincy's robbery; evidence that Hinton's height and weight did not match the description Smotherman gave of the man who robbed him; evidence that on the night of the Quincy's robbery Hinton was wearing clothes that did not match those in the description Smotherman gave of his assailant; evidence that Smotherman failed to describe the prominent scars Hinton has; and evidence that Hinton's place of work at the Bruno's warehouse was too far from the Quincy's restaurant for Hinton to commit the robbery and his absence from the workplace not be noticed. Also, Hinton's ballistics expert testified that there was no evidence that the bullets had been fired by the same gun; and no fingerprints matching Hinton's were ever found. Hinton argues that only the opinion testimony of the State's ballistics experts tied the defendant to these crimes. Also, Hinton *Page 569 
points out that the cash register receipt from Food World indicates that Smotherman was at that store on July 25, 1985. He claims that this receipt created confusion because the robbery actually occurred on July 26, so much confusion, he argues, that the Court of Criminal Appeals put the wrong date in its opinion, and he argues that this confusion was obviously prejudicial to him.
The evidence presented by the State is to be viewed in the most favorable light when deciding upon sufficiency of the evidence. Walker v. State, 416 So.2d 1083 (Ala.Crim.App. 1982). The standard for reviewing the sufficiency of the evidence was set out in Dolvin v. State, 391 So.2d 133 (Ala. 1980). Here, the State produced evidence that someone committed three robberies using an identical modus operandi; that Hinton was identified by the victim of the third robbery; that prior to the robbery of the Quincy's restaurant, the defendant had asked about its closing time and its manager; that the defendant owned a car matching the description of the car that was used in the Quincy's robbery; and that the bullets from all three crimes came from the gun taken from the defendant's house. These facts were properly submitted to the jury and were ample proof from which the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt.
 V
Hinton claims that the law permits the use of polygraph tests to impeach the testimony of a person when the results are inconsistent with that person's trial testimony, citingBryant v. State Farm Fire Cas. Ins. Co., 447 So.2d 181 (Ala. 1984). The testimony produced by the State indicated that the defendant fabricated his testimony about his being at work at the time of the Quincy's robbery; thus, Hinton reasons that if polygraph tests can be used to impeach a witness, they should also be permitted as prior consistent statements to support the credibility of a witness. He argues that no distinction can be made between the quality of the evidence used to impeach a witness and the quality of evidence used to rehabilitate a witness.
The State contends, and we agree, that the results of the polygraph test were properly excluded during the guilt phase of the trial. In Ex parte Dolvin, 391 So.2d 677 (Ala. 1980), this Court held that the reliability of polygraph examinations has not been sufficiently established for these results to be admissible in evidence. We stated that even though 57 years had passed since the decision in Frye v. United States, 293 F. 1013
(D.C. Cir. 1923), the lie detector test had not gained the acceptance required for it to be admissible in a criminal trial; Hinton has produced no scientific evidence to show that the conclusion in Frye and Dolvin is no longer applicable.Bryant v. State Farm, a civil case, does not support the defendant's position, for there the defendant's attorney asked the State Farm investigator, without objection, a question that elicited the fact that the defendant had taken and failed a polygraph examination.
The test results were also properly excluded during the sentencing phase. Section 13A-5-45(d) provides for the admission of any evidence "which has probative value and is relevant to sentence." Polygraph examinations are not probative, because the premise that a machine can reflect whether a person's answers are deceptive has not been sufficiently established, Dolvin, and because the admission of the results of polygraph examinations would tend to distort the truth-finding process. The danger that the jury will be overawed by the polygraph examiner's opinion has been pointed out by the Court of Criminal Appeals. Wynn v. State,423 So.2d 294 (Ala.Crim.App.), cert. denied, 423 So.2d 294 (Ala. 1982). At least three states have held that polygraph results are not admissible in capital sentencing proceedings. Hendrickson v.State, 285 Ark. 462, 688 S.W.2d 295 (1985); People v. Szabo,94 Ill.2d 327, 68 Ill.Dec. 935, 447 N.E.2d 193 (1983), cert. denied, 479 U.S. 1101, 107 S.Ct. 1330, 94 L.Ed.2d 181 (1987);State v. Copeland, 278 S.C. 572, 300 S.E.2d 63 (1982), cert. denied, *Page 570 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed.2d 367 (1983).
 VI
We have carefully read the record, studied the opinion below, and considered the arguments of counsel, and we have found no reversible error. Therefore, the judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
HORNSBY, C.J., and JONES, ALMON, SHORES, ADAMS, HOUSTON, STEAGALL, and KENNEDY, JJ., concur.