BURKE, Judge.
Marqueze Taron Smith was convicted of two counts of murder made capital because the murder was committed during a kidnapping in the first degree or an attempt thereof, see § 13A-5-40(a)(1), Ala.Code 1975, and because the murder was committed during a robbery in the first degree or an attempt thereof, see § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 11 to 1, recommended that Smith be sentenced to death. - The trial court followed the jury’s recommendation and sentenced Smith to death. Smith appeals his convictions and his sentences.

Facts

At trial, the State set forth evidence indicating the following.
Around 6 a.m. on August 12, 2003, a few employees of Interstate Steel discovered the body of a deceased person lying across a dirt road near the business. That deceased person was later identified as Jeremy Black. When Black’s body was discovered, he was wearing multiple T-shirts, a pair of boxer shorts, and one sock that had been partially pulled off his right foot. He did not have a sock on his left foot, and he did not have on any shoes. Several bullets and shell casings were found near Black’s body. Black’s vehicle was discovered about a mile from where his body was discovered. When his vehicle was discovered, the glove compartment was open, and investigators determined that several items were missing from the vehicle, including the radio and license plate.
An autopsy performed by a forensic pathologist with the Alabama Department of Forensic Sciences revealed that Black died from multiple gunshot wounds. Two gunshots had entered Black’s back and exited his chest, and seven gunshots had entered Black’s chest and exited his back. One of the gunshot entry wounds in Black’s back was described as a “near contact” wound and the other entry wound in Black’s back was described as a “contact” wound. The exit wounds in Black’s back were “shored,” which indicated that Black’s back was in *1009 contact with a hard surface when the bullets exited his back.
A firearms examiner with the Alabama Department of Forensic Sciences examined a .45 caliber Colt brand handgun, a .45 caliber Ruger brand handgun, and 9 bullets or bullet fragments recovered during the investigation into Black’s murder. The firearms examiner determined that two of those bullets had been fired from the Ruger handgun and that five of those bullets had been fired from the Colt handgun. One bullet could not be conclusively matched to either handgun because the bullet was damaged, but it had the same rifling series as the Colt handgun. One bullet fragment did not have any rifling that could be examined; thus, it could not be matched to either hándgun.
During the morning of August 11, 2003, Smith, Christopher Smiley, and Smith’s uncle, Patrick Smith (“Patrick”), were hanging out and drinking alcohol at a house that belonged to Smith’s grandmother, Novella Smith (“Novella”). They parted ways around 11 a.m., but they reunited that night. Early during the night of August 11, 2003, Smith, Smiley, and Patrick were hanging out with other people at Smiley’s cousin’s house. They were drinking alcohol and smoking marijuana. Smith borrowed Smiley’s phone and used it to call Black. Following the phone call, Black came to Smith’s location and sold marijuana to him. Around midnight, after moving to a different location, Smith again used Smiley’s phone to call Black. Then, Smiley, Smith, and Patrick went to Maggie Mae Johnson’s apartment. Johnson was Patrick’s girlfriend. Smiley asked Patrick and Smith whether they wanted him to give them a ride to Novella’s house. Patrick responded: “No, I’m going to stay here. I got to get me somebody. I need some money.” (R. 1064.) Shortly thereafter, Smiley left and went to the parking lot of the local Wal-Mart discount store to talk to a woman he had met a couple of days earlier.
According to Smiley’s trial testimony, after he finished talking to the woman and was leaving the Wal-Mart parking lot, he received a telephone call from Patrick, but the call was quickly disconnected. Then, around 1:30 a.m., Smiley received a phone call from Smith. Smith asked Smiley to pick him and Patrick up at a particular gas station. When Smiley arrived at that gas station, he saw Patrick and Patrick got in Smiley’s vehicle. Patrick then instructed Smiley to go to another location. Pursuant to Patrick’s instructions, Smiley turned down a dirt road and parked his vehicle. Black’s vehicle and Smith were there. Patrick and Smith then began taking items from Black’s vehicle and putting them into Smiley’s vehicle. After Patrick, Smith, and Smiley left that location in Smiley’s vehicle, Patrick instructed Smiley to go to another location. As they drove by that location, Patrick pointed to a body lying on the ground.[1] Smiley then asked Patrick whether he had shot somebody. Patrick responded by pulling out a handgun and asking Smiley whether he thought “this [was] a mother fucking game.” (R. 1078.) Patrick then told Smiley that, shortly before Black died, Black said that he had a little girl and he a§ked Smith “why you doing this.” (R. 1079.) Smiley testified that, after they drove by Black’s body and Patrick had responded to Smiley’s question, Smith told Smiley that Patrick shot Black two times before Patrick’s gun jammed and that Smith then pushed Patrick out of the way and “just started shooting.” *1010 (R. 1080.) Smith also told Smiley that Black was “squirming like a worm.” (R. 1081.) Smiley, Patrick, and Smith then went to Novella’s house. After a short time, they left Novella’s house and went to Johnson’s apartment. At Johnson’s apartment, they unloaded the items that had been taken from Black’s vehicle. After the items were unloaded, Smiley and Smith went to Smiley’s house while Patrick stayed at Johnson’s apartment.
At trial, Smiley identified the Colt brand handgun used in Black’s murder as a gun that he had previously owned. Smiley testified that, before Black’s murder, he had given that gun to Patrick to clean. However, Smiley testified that, after he and Smith left Johnson’s apartment on the night of the murder, he saw Smith with the Colt handgun in his possession. Specifically, Smiley testified that, when Smith got out of Smiley’s vehicle, the gun was lying on the seat where Smith had been sitting. Smiley further testified that he grabbed the gun off the seat and took it inside his house.
The morning after the murder, an investigator called Smiley’s phone because the investigator had received a copy of the telephone numbers that had recently called Black’s cell phone, and one of those numbers belonged to Smiley. The investigator asked Smiley to come to the police station and talk to investigators. Smiley voluntarily complied with that request. At trial, Smiley testified that, before he went to talk to the investigators, he put the Colt handgun in a Wal-Mart bag and gave it to Smith. Smiley then gave Smith a ride to Novella’s house. Smiley testified that, when he dropped Smith off at Novella’s house, Smith did not go inside the house. Instead, Smith went around the right side of the house.
At trial, Smiley admitted that, on August 12 and 18, 2008, he gave two separate statements to investigators that did not implicate Smith in Black’s murder. Those statements implicated only Patrick. In fact, Smiley’s August 12 statement did not mention Smith, and the August 13 statement mentioned only that Smiley and Smith had hung out on the night of the murder. However, on August 15, 2003, Smiley gave a statement to investigators that implicated Smith in Black’s murder. Also, on November 8, 2011, Smiley gave another statement that implicated Smith. At trial, Smiley testified that he was telling the truth at trial and that, to the extent his trial testimony did not match his previous statements, he had lied in his previous statements.
Based on his participation in the crime, Smiley was originally charged with capital murder. However, in September 2009, a little less than 3 years before Smith’s trial, Smiley pleaded guilty to second-degree robbery and was sentenced, as a habitual offender, to 20 years in prison. As part of Smiley’s plea, he agreed to testify at Smith’s trial and to tell the truth.
In August 2003, Angela Delores Steel Smith (“Angela”), Smith’s aunt and Patrick’s sister, discovered a handgun in the outside storage room of her apartment. Angela testified that the handgun did not belong to her and that, after discovering the handgun, she immediately telephoned the police to inform them of her discovery. That handgun was later identified as the .45 caliber Colt handgun that was involved in Black’s murder. Angela also testified that, in August 2003, her mother, Novella, lived about half of a block away from her.
In August 2003, law-enforcement officers went to Johnson’s apartment looking for Patrick. Johnson allowed the officers to come inside the apartment, and they found Patrick hiding in an upstairs bedroom. A .45 caliber Ruger brand handgun and several items of personal property *1011 that had belonged to Black were found near where Patrick was hiding. That handgun was later identified as the Ruger handgun that was involved in Black’s murder. These items of personal property included various papers with Black’s or Black’s mother’s name on them, stereo equipment from Black’s vehicle, and clothing items that belonged to Black.
On August 14, 2008, Smith gave the following statement to law-enforcement officers:
“On the night of Monday, August the 11th, 2003, at about 11:00-12:00 p.m., me and my uncle, Patrick Napoleon Smith, were standing outside of the Cardinal Apartments when my uncle asked me to call someone to buy some weed. At first I tried to call someone else, but I could not reach him. I called Jeremy Black, who I know and have known since I was about five.
“I contacted Jeremy and told him that I needed a $20.00 sack, meaning $20.00 worth of marijuana.
“I told him that I did not have any transportation, so he said that he would bring it right over.
“We waited until he arrived in about 15-20 minutes.
“After Jeremy arrived, my uncle asked Jeremy to drive us over to his cousin’s house. My uncle explained that his cousin lived somewhere near Blue Bird Apartments.
“Jeremy agreed to take us over there. So he got out and let us into his whitish looking Monte Carlo or Cutías car.
“He told us that the passenger’s side door didn’t open. I entered the backseat, and my uncle got in the front passenger’s seat.
“Jeremy drove to a point behind Blue Bird Apartments, then stopped and started dialing numbers on his cell phone.
“My Uncle Patrick pulled out his pistol, which was grayish black with a clip. Then he told Jeremy to ‘get right,’ which meant to give up the money or not make any foolish moves.
“My uncle then told Jeremy to get into the backseat. Jeremy at first raised his hands and seemed to briefly resist my uncle’s demands, but then he got out of the car, and. my uncle climbed over into the driver’s seat as I climbed up front into the passenger’s seat.
“My uncle told Jeremy to lay down, and he did.
“Uncle Patrick then drove to Trinity. While we were on the way my uncle told Jeremy that Tou need to watch the bitches that you fuck with!’
‘We went onto Woodall Road and turned onto Trinity Lane. After we crossed the railroad tracks and made a left turn, my uncle drove on down and turned right into a path. He then turned the lights off and stopped the car. He got out of the car and told Jeremy to get out and to lay on the ground face down.
“Before Jeremy got out of the car he said, ‘Man, I have got a little girl!’ He also called out my name, ‘Marqueze!’ But I didn’t say anything, because I feared what my uncle may have done.
“Then Jeremy got out of the car and walked towards the front of the car, and he laid face down on the ground.
“I began getting out of the car as he walked forward.
“My uncle then got on top of Jeremy and placed his knee on his back.
“I then went over to my uncle and grabbed his shoulder and told him, ‘Hold up. Hold up!’
*1012 “Then my uncle pointed the gun at Jeremy’s back and tried to shoot it, but the weapon jammed. He then pulled back the top part and cocked the gun. He then pointed the pistol away and fired it one time.
“My uncle then pointed the gun at Jeremy’s back, fired it one time, pausing for a second, then he shot him again in the back.
“My uncle then raised up. I had by then backed up after knowing that I couldn’t stop him and got back into the car.
“Jeremy cried out briefly. Then he raised his hands and started to roll over onto his back.
“My uncle then shot Jeremy about four more times.
“I was sitting behind the wheel with my feet outside the car and my head hanging down.
“My uncle then came and told me to get over into the passenger’s seat, and I did. He got in and drove us to a nearby dirt road next to a cotton field.
“I then got out of the car and went to a junk yard and walked around in disbelief.
“My uncle was going through the car getting the stereo equipment, speakers, and he also got a large light-colored speaker box out of the trunk.
“He took some of the equipment and placed it in the cotton field.
“My uncle called Chris using a cell phone, and he asked him to come and pick us up.
“I was already running off by then. I had made it to Woodall Road when I saw Chris Smiley driving a white Cadillac. He stopped and I got in.
“Then he drove towards where I was coming from until he saw my uncle Patrick. We stopped and picked him up.
“Chris drove us back to Decatur and stopped at the MPG store on Spring Avenue. My uncle went in and bought cigarettes, and Chris checked his tire.
“My uncle gave me about $40.00. Chris dropped me off at Summer Place Apartments.”
(C. 557-60; R. 1195-1200.)
After Smith was confronted with evidence indicating that two guns were used in Black’s murder, Smith gave the following statement to law-enforcement officers:
“I saw Chris Smiley’s gun for the first time about three and a half weeks ago. It was a blue steel gun with wood grips. It was in a holster. He told me it was a .45. I didn’t ask Chris to bring his gun out on the night this all happened. I think he might have given Patrick his gun. I remember my uncle having Jeremy Black down. His gun jammed or something. He racked the slide and shot one shot in the woods. Then he put two into his back. Jeremy rolled over, but before that he reached behind him for something. It seemed like he was switching hands or something. And then there was a bunch of more shots. I want you to know that before my uncle fired any rounds off I grabbed him and told him to hold up, hold up. He shook me off. Then he put the gun in Jeremy’s back and pulled the trigger, I went to the car after that. Later, after Chris picked us up, I remember him saying, ‘I’m disappointed in my gun. I like Chris’s gun a lot better.’ I guess he must have had Chris’s gun. I never saw what he did with it. Patrick was wearing a gray shirt with a ‘Public enemy' sign, a man in cross hairs, I don’t know why Chris is saying he gave his gun to me. I swear I never had that gun in my hand.”
(R. 1251-52.)

Discussion

At trial, it was undisputed that Smith was present when Black was murdered. *1013 The defense’s theory was that, although Smith was present at the scene when Black was murdered, Smith took no part in the murder. Consistent with Smith’s statements to investigators, the defense argued that Patrick fired all the gunshots that killed Black and that Smith had no intent to cause Black’s death. The defense contended that Smiley was not a credible witness. The State contended that Smiley’s statements and trial testimony implicating Smith in Black’s murder were credible.
On appeal, Smith argues, among other things, that his rights were violated at trial when the State presented testimony and argument concerning a polygraph test that was taken by Smiley (hereinafter referred to as the “polygraph evidence”). Specifically, Smith argues that the State improperly used the polygraph evidence to bolster the credibility of its main witness.
During the State’s case-in-chief, Smiley testified:
“[Prosecutor]: So you went up to talk to the sheriffs folks after this phone call, right?
“[Smiley]: Yes, sir.
“[Prosecutor]: And when you got up there to talk to them the first time, you didn’t tell them everything, did you?
“[Smiley]: No, sir.
“[Prosecutor]: You started out covering up for everybody and lying, right?
“[Smiley]: Yes, sir.
“[Prosecutor]: And tell us why you did that.
“[Smiley]: Well, for one I was afraid.
“[Prosecutor]: Afraid of what or who? •
“[Smiley]: Patrick.
“[Prosecutor]: Patrick a bad guy?
“[Smiley]: Yes, sir.
“[Prosecutor]: But you — you didn’t say anything about Marqueze either the first time, did you?
“[Smiley]: No, sir.
“[Prosecutor]: Why didn’t you tell them about what Marqueze had done and what he had said?
“[Smiley]: Because at the time we was close, you know.
“[Prosecutor]: And then so you talked to the sheriffs department that first day, and they took some kind of statement from you. What else did you do?
“[Smiley]: Took a lie detector test.
[[Image here]]
“[Prosecutor]: .... And then after you talked to the police the first time, they didn’t believe you were telling all the truth, right?
“[Smiley]: I guess so.
“[Prosecutor]: So they took you to take [a] lie detector test. What was the result of that?
“[Smiley]:' I’m not sure until this day.
“[Prosecutor]: Okay. But anyway they came to you and said you hadn’t told them all the truth, right?
“[Smiley]: Yes, sir.
“[Prosecutor]: And then after that did you talk to the sheriffs department again?
“[Smiley]: Yes, sir.”
(R. 1091-93.) There was no objection to this testimony.
Later during the State’s case, the following exchange occurred during Investigator Terry Kelly’s testimony:
“[Prosecutor]: After a statement was taken from Patrick Napoleon Smith, what did y’all start working on next?
“[Investigator Kelly]: The next part was Sheriff Bartlett wanted to have Christopher Smiley polygraphed to see *1014 if we could get him to verify the veracity of his first statement.
“[Prosecutor]: Y’all had some questions I take it at that point that he wasn’t telling everything?
“[Investigator Kelly]: Yes, sir.
“[Prosecutor]: Tell us what happened then.
“[Investigator Kelly]: We set it up with the Decatur Police Department. We don’t have one, but the Decatur Police Department has two. We used them to administer a polygraph to Mr. Smiley. We dropped him off [at] the Decatur Training Center, which is where their office is located, for the polygraph. And we left, which is common. That way they have absolute quiet and no interruptions.
“[Prosecutor]: Did y’all go back and talk to him after he took the polygraph test?
“[Investigator Kelly]: Once he was finished with the polygraph we were called and told and notified that he showed deceptive as to Marqueze’s involvement in this.
“[Prosecutor]: Did y’all go back and talk with him?
“[Defense counsel]: Your Honor, I object to that characterization.
“The Court: Sustained.
“[Defense counsel]: I don’t know anything in the report is material in this case beyond their conclusion that Christopher Smiley was not credible. I see nothing else in the report indicates what part of that is — I object to that.
“The Court: I have sustained it.
“[Defense counsel]: Move to strike and ask for a mistrial.
“The Court: I have sustained. I will deny that.”
(R. 1242-44.)
During the State’s rebuttal closing argument, the prosecutor stated:
“Now, [defense counsel] wants to attack Mr. Smiley in his statement. Chris Smiley came in here and told you, ‘Yeah, I lied.’
‘Well, what did he lie about? He lied about Marqueze. He didn’t implicate Marqueze. He gave a statement on the 13th-12th and 13th. He didn’t implicate Marqueze. He took a polygraph. This is without Marqueze. He comes back the 15th, and then he tells what happened. And he implicates Marqueze. Tells the truth. There was no deal at that time, no deal whatsoever. That was three or four days after this happened when it is fresh on his mind, and he told what happened. He tried his best to protect Marqueze, but he couldn’t do it. There was a deal cut, and I submit to you there ain’t a prosecutor around that could have convicted Chris Smiley of capital murder because he wasn’t there. He participated in the robbery. That is what he pled to. Yeah, he got a good deal, but the deal making is over and there ain’t going to be more deals with Mr. Smiley. And his part of the deal was to come back and tell the truth.
“Now, yeah, he may have got stuff wrong, and he may have even lied on this stand the other day, but what he has been consistent about since August the 15th, 2003, is that Marqueze told him, T shot the man seven times.’
“He has not wavered on that, not an ounce.”
(R. 1371-72; emphasis added). There was no objection to these statements.
*1015 In Alabama, “it is well settled that evidence derived from a polygraph examination is inadmissible.” A.G. v. State, 989 So.2d 1167, 1177 (Ala.Crim.App.2007). Furthermore, “ ‘both the results of and the fact that a person did or did not take a polygraph test are generally inadmissible.’” A.G., 989 So.2d at 1177 (quoting Bostick v. City of Gadsden, 642 So.2d 469, 471 (Ala.Civ.App.1993)); see also Johnson v. State, 46 Ala.App. 725, 725, 248 So.2d 763, 764 (Ala.Crim.App.1971) (stating that “[t]he fact of the taking of he detector tests and the result of such tests are not admissible as evidence in this state”).
In Ex parte Clements, 447 So.2d 695 (Ala.1984), the defendant, prior to trial, “offered to stipulate to the introduction into evidence of a polygraph examination,” and the State refused to stipulate. The Alabama Supreme Court, in holding that the trial court properly denied admission of the results of the polygraph examination, stated:
“[T]he results of polygraph examinations are, in general, inadmissible in Alabama. Stewart v. State, 398 So.2d 369 (Ala.Cr.App.1981). They are admissible, however, upon stipulation of the parties, subject to certain conditions which relate to the accused’s knowledge of his rights thereunder and the trial court’s discretion relating to the conduct.of the test itself. See Wynn v. State, 423 So.2d 294, 299-300 (Ala.Cr.App.1982). Nothing in that case, however, nor in any other Alabama case to which we have been cited, requires the prosecutor’s consent to an offer of the accused to stipulate to the admission of the results of the accused’s polygraph examination. As yet, Alabama has not adopted the premise of Wisconsin that such tests have achieved such a degree of reliability and scientific recognition ‘that their unconditional rejection is no longer appropriate.' McMorris [v. Israel], 643 F.2d [458,] 465 [ (7th Cir.1981) ].”
Ex parte Clements, 447 So.2d at 698.
The results of a polygraph test are inadmissible because they lack any probative value. Ex parte Hinton, 548 So.2d 562, 569 (Ala.1989). As the Alabama Supreme Court has stated: “Polygraph examinations are not probative, because the premise that a machine can reflect whether a person’s answers are deceptive has not been sufficiently established, [Ex parte] Dolvin, [391 So.2d 677 (Ala.1980) ], and because the admission of the results of polygraph examinations would tend to distort the truth-finding process.” Hinton, 548 So.2d at 569. Furthermore, there is a “danger that the jury will be overawed by the polygraph examiner’s opinion.” Id. This Court has stated that “the uncritical acceptance of polygraph results tends to induce, a jury to reject other evidence which is in fact more reliable.” Hinton v. State, 548 So.2d 547, 560 (Ala.Crim.App.1988).
On appeal, Smith argues that the State impermissibly used the polygraph evidence to bolster the credibility of Smiley’s statements implicating Smith and to discredit the defense’s theory of the case. Specifically, Smith argues that the State improperly bolstered its case by presenting testimony and argument indicating that Smiley gave two statements to the police that placed all thé blame for the murder on Patrick, and then, after Smiley took a polygraph test, he gave statements implicating Smith.
At trial, Smith did not make any objections to the polygraph evidence based on the arguments he now makes on appeal. Smith’s only objection at trial was to the “characterization” of the polygraph-test results, and that objection was sustained.
*1016 Thus, we review the presentation of the polygraph evidence for plain error only.
Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In Wilson v. State, 142 So.3d 782, 751 (Ala.Crim.App.2010) (opinion on return to remand), this Court stated:
“ ‘[T]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.’ Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004). That is, the appellant must establish that an alleged error, ““not only seriously affect[ed] [the appellant’s] “substantial rights,” but ... also ha[d] an unfair prejudicial impact on the jury’s deliberations.’ ” ’ Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). Only when an error is ‘so egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings,’ will reversal be appropriate under the plain-error doctrine. Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (internal citations and quotations omitted). Although the ‘failure to object does not preclude [appellate] review in a capital case, it does weigh against any claim of prejudice’ Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985) (citing Bush v. State, 431 So.2d 563, 565 (1983)) (emphasis in original). As the United States Supreme Court has noted, the appellant’s burden to establish that he is entitled to reversal based on an unpre-served error ‘is difficult, “as it should be.” ’ Puckett v. United States, 556 U.S. 129,135,129 S.Ct. 1423,173 L.Ed.2d 266 (2009) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)).”
On appeal, the State does not deny the impropriety of testimony or argument concerning a polygraph test. Instead, the State argues that, in the present case, the polygraph evidence was harmless and did not rise to the level of plain error for six reasons.
Rule 45, Ala. R.App. P., provides:
“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal *1017 of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
In Ex parte Crymes, 630 So.2d 125 (Ala.1993), the Alabama Supreme Court stated:
“In determining whether the admission of improper testimony is reversible error, this Court has stated that the reviewing court must determine whether the ‘improper admission of the evidence ... might have adversely, affected the defendant’s right to a fair trial,’ and before the reviewing court can affirm a judgment based upon the ‘harmless error’ rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise• prejudice a substantial right of the defendant.”
630 So.2d at 126. See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (holding that the proper harmless-error inquiry asks, absent the improperly introduced evidence, “is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty”).
First, the State argues that the polygraph evidence was harmless and did not rise to the level of plain error because the trial court sustained Smith’s objection during Investigator Kelly’s testimony and thus eradicated any prejudicial effect of the polygraph evidence. However, as mentioned earlier, that objection was explicitly limited to Investigator Kelly’s specific characterization of the polygraph-test results. Otherwise, there was no objection, much less a sustained objection, to the prosecutor’s questions or Investigator Kelly’s testimony concerning the polygraph test. Furthermore, there was no objection to the prosecutor’s statement during closing argument concerning the polygraph test or to Smiley’s testimony concerning the polygraph test. Thus, we find that the effect on the jury of all the polygraph evidence was not eliminated simply because the trial court sustained a limited objection to one piece of the polygraph evidence.
Next, the State argues that the polygraph evidence was harmless and did not rise to the level of plain error because the actual results of the polygraph test were never admitted into evidence. However, Investigator Kelly testified concerning the results of the polygraph test, and, again, Smith’s sustained objection was limited solely to Investigator Kelly’s specific characterization of the polygraph test results. The objection did' not address other testimony and argument implying that the results of the polygraph test indicated that Smiley was being deceptive up to a certain point in time, which was a crucial question for the jury.
Next, the State argues that the polygraph evidence was harmless and did not rise to the level of plain error because, the State says, the polygraph evidence “was not intended to bolster Smiley’s credibility.” (State’s brief, at 24.) We disagree. Smiley testified at trial that he lied during his two initial statements to police, which did not implicate Smith in Black’s murder, and that he told the truth during his later statements when he did implicate Smith in Black’s murder. Evidence indicating that Smiley took a polygraph examination between his initial statements and his later statements bolsters his trial testimony that he was telling the truth in the later statements when he implicated Smith. In fact, during his closing argument, the prosecutor explicitly pointed out to the jury that *1018 Smiley’s statements that did not implicate Smith came before he took the polygraph examination and that Smiley’s statements that did implicate Smith came after he took the polygraph examination.
Next, the State argues that the polygraph evidence was harmless and did not rise to the level of plain error because it was cumulative of other evidence indicating that Smiley had been deceptive. Specifically, the State argues that “Smiley admitted to lying to the police to cover up Smith’s involvement in the murder, so the jury already knew that he had been deceptive.” (State’s brief, at 24.) However, the State’s argument misses the point. The issue for the jury was not whether Smiley ever lied to the police. The nature of inconsistent statements necessitates that Smiley was lying to the police at some point when he gave the statements. Instead, the jury needed to determine when Smiley was lying to the police. Specifically, the jury had to determine whether Smiley was lying in his initial statements when he did not implicate Smith or whether Smiley was lying in his later statements when he did implicate Smith. More specifically, the jury had to determine whether Smiley’s trial testimony was credible when he testified that he was lying to the police when he gave his initial statements that did not implicate Smith. The polygraph evidence bolstered that trial testimony. The polygraph evidence was not merely cumulative of Smiley’s trial testimony.
Next, the State argues that the polygraph evidence was harmless and did not rise to the level of plain error because, the State says, Smith used the evidence himself. Specifically, the State points out that Smith frequently argued that Smiley was not credible. However, again, the polygraph evidence indicates that Smiley was lying at a particular time. The defense did not elicit the polygraph evidence, and there is no indication in the record that the defense ever specifically relied on the polygraph evidence. Instead, the defense simply argued that Smiley could not be trusted. On the other hand, the State argued that Smiley could be trusted when he made statements implicating Smith in Black’s murder, which happened after Smiley took the polygraph test.
Finally, the State argues that the polygraph evidence was harmless and did not rise to the level of plain error because, the State says, there was sufficient evidence to support Smith’s capital-murder conviction without Smiley’s testimony. We disagree. We agree that there was other evidence that could give some indication of Smith’s guilt. Specifically, it was undisputed that Smith and Patrick were the only two people other than the victim who were present when the murder was committed. Furthermore, other evidence indicated that two guns were used in the murder and that those two guns were found at different locations. However, we doubt whether that evidence alone is sufficient to support Smith’s conviction. In any event, regardless of whether that evidence in isolation would be sufficient, Smith argued at trial that, consistent with his statement to investigators, Patrick used both guns to murder Black while the State argued at trial that Patrick used one gun and Smith used the other gun to murder Black. It was up to the jury to weigh the evidence, but Smiley’s testimony definitely bolstered the State’s argument; thus, Smiley’s testimony definitely affected that weighing process. We cannot say that if Smiley’s testimony was removed, the jury would have reached the same decision. Only Smiley’s testimony contradicted the version of events contained in Smith’s statement to investigators, and only Smiley’s testimony placed the Colt handgun directly in Smith’s possession after the murder. *1019 Therefore, we believe that Smiley’s testimony affected the outcome of the trial.
We again note that the State does not deny that testimony or argument concerning a polygraph test is improper, and, based on the foregoing, we hold that the State’s arguments are contrary to established precedent of this Court and the Alabama Supreme Court. We further hold that, under Alabama law, presentation of testimony and argument concerning a polygraph test is an obvious, indisputable error. A review of the record in this case leaves little doubt that the jury likely would have used the polygraph evidence to decide that the State’s main witness was telling the truth, and, in its closing argument, the State asked the jury to do just that. Alabama courts have not allowed the defendant to use polygraph evidence to show his innocence; thus, we cannot allow the State to use polygraph evidence to prove the defendant’s guilt. See Ex parte Clements, supra. In the present case, as explained earlier, the polygraph evidence clearly bolstered Smiley’s trial testimony, and Smiley’s testimony was crucial to the State’s case; thus, the error adversely affected the outcome of the trial. Furthermore, the trial court failed to grant Smith’s motion to strike Investigator Kelly’s testimony concerning the results of the polygraph test, and the trial court failed to give any curative instruction concerning the polygraph evidence. Therefore, we hold that the polygraph evidence either has or probably has adversely affected Smith’s substantial rights; thus, plain error occurred.
Because plain error occurred during the guilt-phase of Smith’s trial, we reverse Smith’s convictions and sentences, and we remand this case for a new trial.[2]
REVERSED AND REMANDED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. That body was later identified as Black, but Patrick did not initially tell Smiley the identity of the deceased person.

. Concerning another issue raised by Smith on appeal, he makes a very strong argument that a material variance existed between the allegations in the indictment and the proof presented by the State at trial. However, because we reverse Smith’s convictions and sentences based on another issue, we need not decide at this time whether a fatal variance existed.